IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,515

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER M. HARRIS,
*Appellant*.

SYLLABUS BY THE COURT

The residual clause "or any other dangerous or deadly cutting instrument of like character" in K.S.A. 2019 Supp. 21-6304 is unconstitutionally vague because it fails to provide an explicit and objective standard of enforcement.

Review of the judgment of the Court of Appeals in an unpublished opinion filed January 19, 2018. Appeal from Sedgwick District Court; JOHN J. KISNER, JR., judge. Opinion filed July 17, 2020. Judgment of the Court of Appeals affirming in part and reversing in part the district court is reversed. Judgment of the district court is reversed, and the case is remanded with directions.

*Kasper C. Schirer*, of Kansas Appellate Defender Office, argued the cause, and *Kimberly Streit Vogelsberg* and *Clayton J. Perkins*, of the same office, were on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

STEGALL, J.: In Kansas, it is a crime for a convicted felon to possess a knife. At first blush, the statute appears straightforward. But the statute defines a knife as "a

1

dagger, dirk, switchblade, stiletto, straight-edged razor or any other dangerous or deadly cutting instrument of like character." K.S.A. 2019 Supp. 21-6304. And figuring out when an object is a "knife" because it is a "dangerous or deadly cutting instrument of like character" is not as easy as one might suppose. See, e.g., *Crocodile Dundee* (Rimfire Films 1986) ("That's not a knife . . . *That's* a knife."). Indeed, no one has argued the statute makes it illegal for convicted felons to possess the utensil commonly used in kitchens to butter bread or slice vegetables. But does it? After all, it is a cutting instrument, is universally referred to as a knife, and it could conceivably be dangerous. Today we are tasked with deciding whether the uncertainty in the residual phrase in K.S.A. 2019 Supp. 21-6304 is so great that the law is impermissibly and unconstitutionally vague. We conclude it is.

FACTUAL AND PROCEDURAL BACKGROUND

Christopher M. Harris is a convicted felon. When he and another man got into an altercation on a Wichita street, Harris pulled out a pocketknife. A police cruiser was in the area and the officer turned his spotlight onto the men. The officer observed Harris dropping an object which turned out to be the pocketknife.

The State charged Harris with aggravated assault, criminal possession of a weapon by a convicted felon, and criminal use of a weapon. At his jury trial, Harris testified he felt in fear of his life and opened the knife only for protection. The pocketknife had a 3 and 1/2-inch blade with serrations. A jury convicted Harris of criminal possession of a weapon and acquitted him of the other two charges.

Before trial, however, Harris had vigorously defended against the possession charge by claiming first that the law was unconstitutionally vague and second that he was entitled to a mistake of law defense. See K.S.A. 2019 Supp. 21-5207(b)(4) ("A person's reasonable belief that such person's conduct does not constitute a crime is a defense if . . .

2

such person acts in reliance upon an official interpretation of the statute, regulation or order defining the crime made by a public officer or agency legally authorized to interpret such statute.").

Harris first moved to dismiss the possession charge on constitutional grounds. He argued the statutory definition of a knife was unconstitutionally vague both in general and when applied to his case because it did not include a pocketknife as a prohibited weapon. The district court denied the motion, ruling Harris lacked standing because the knife at issue clearly fell within the residual clause of the statute prohibiting the possession of "any other dangerous or deadly cutting instrument of like character." See *State v. Brown*, 305 Kan. 674, 698, 387 P.3d 835 (2017) (noting a defendant lacks standing to challenge a statute as unconstitutionally vague when the defendant's act clearly falls within the statute).

Next, Harris sought approval to introduce evidence that the State of Kansas—through Harris' parole officer Alexis Olave—had told him that the pocketknife was not a prohibited knife. Harris proffered evidence that before the incident, Olave had advised Harris that he could carry the precise knife at issue, and he relied on that advice. Harris also provided a letter he had received from Olave after the incident in which she told him, "[Y]ou are allowed to have a pocket knife less than 4 inches in length while on post release. However, if the pocket knife is used in a threatening manner, then it can be viewed as a violation or as a crime."

The State filed a motion in limine to exclude this evidence. Ultimately, the State relied on the purely legal argument that parole officers are not legally authorized to interpret any statutes and so anything Olave may have said was legally irrelevant to a potential mistake of law defense under K.S.A. 2019 Supp. 21-5207(b)(4). Adopting the State's position, the district court granted the motion and excluded Olave's statements because they were not "an official interpretation of the statute."

Harris moved to reconsider. Along with the evidence already proffered, he submitted the Kansas Department of Corrections Division of Community and Field Services Supervision Handbook. The handbook stated: "An ordinary pocket knife with a blade no longer than 4 inches is *not* considered by law to be a dangerous knife, or a dangerous or deadly weapon or instrument." At a hearing on his motion to reconsider, Harris personally testified, "I went to [s]tate orientation just a couple of months before this, the whole place told me, everybody at that place told me and they give me that [handbook] stating and they told me I could own that knife." The district court ruled again that Olave's advice—or implicitly, the advice of anyone at the Kansas Department of Corrections (KDOC)—on what "counted" as a knife under the relevant statute was not an official opinion upon which Harris could rely. The district court denied the motion to reconsider. During trial, after the same evidence was proffered by Harris, the district court sustained its pretrial order excluding all evidence in support of Harris' mistake of law defense. Harris was then convicted of violating K.S.A. 2019 Supp. 21-6304.

On appeal, Harris claimed the district court erred by rejecting his vagueness challenge to the statute and by excluding all evidence supporting his mistake of fact defense. The Court of Appeals quickly dispatched with the constitutional challenge. The panel held the language of the statute would be "easily understood by a person of ordinary intelligence" because it employed "words commonly used." *State v. Harris*, No. 116,515, 2018 WL 473605, at *4 (Kan. App. 2018) (unpublished opinion). Moreover, "the statute lists several examples of objects that qualify as a knife" and a "person of ordinary intelligence would understand that all of the specifically enumerated items are objects that have a sharp blade or edge." 2018 WL 473605, at *4. The Court of Appeals concluded that the gravamen of the statute was plainly and obviously "not the length or width of an object" but "whether, like the listed items, the object is a dangerous or deadly cutting instrument." 2018 WL 473605, at *4. Based on this statutory interpretation, the panel held that Harris failed to show the language of the statute was

4

"so vague that it fails to give warning to people of ordinary intelligence of the prohibited conduct *or that the statute is susceptible to arbitrary and discriminatory enforcement*." (Emphasis added.) 2018 WL 473605, at *4.

Next, the panel considered the district court's evidentiary ruling vis-à-vis Harris' mistake of law defense. First, the lower court determined a parole officer is a public officer under K.S.A. 2016 Supp. 21-5111(aa)(5) (public officer includes law enforcement officer) and K.S.A. 2016 Supp. 21-5111(p)(2) (law enforcement officer includes any KDOC officer and employee). Then, it found that the KDOC is an administrative agency. 2018 WL 473605, at *6.

Finally, to decide whether Olave and the KDOC could legally interpret the words "weapon" and "knife" in the statute, the panel conducted a lengthy review of the relevant law and ultimately concluded that "the Secretary of Corrections, through the Department of Corrections, and Harris' parole officer, who is a public officer, were authorized to interpret the statute. The Handbook and the information provided to Harris by his parole officer constituted official interpretations of the statute." 2018 WL 473605, at *8. After conducting a harmless error analysis, the panel found "there is at least a reasonable probability that the outcome of the trial would have been different had the court allowed Harris to introduce the parole officer's testimony and the Handbook to the jury." 2018 WL 473605, at *8. Thus, the lower court reversed his conviction and remanded Harris' case for a new trial. 2018 WL 473605, at *7-8.

Each party petitioned this court for review of the portion of the Court of Appeals' decision that went against them, and we granted both petitions.

DISCUSSION

Because we resolve this case in Harris' favor on constitutional grounds, we need not reach the evidentiary issue raised by the State's petition for review. At the outset, it is also important to note that while the State raised numerous jurisdictional and preservation claims in response to Harris' vagueness challenge in the proceedings below, the State did not advance those claims in its petition for review. As a result, Harris' vagueness challenge to K.S.A. 2019 Supp. 21-6304 is squarely before us on the merits.

Before discussing the merits, however, we pause to acknowledge that the parties devote considerable space in their briefs to arguing about whether this is an as-applied or facial challenge. The State insists it is an as-applied challenge because the district court ruled on those grounds. Harris, meanwhile, points out that the traditional differences between an as-applied and a facial challenge fade considerably in the context of an overbroad law that invites arbitrary enforcement. See *Johnson v. United States*, 576 U.S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). In *Johnson*, the Court found the residual clause "[any felony that] involves conduct that presents a serious potential risk of physical injury to another" in the Armed Career Criminal Act unconstitutionally vague despite that fact that "there is some conduct that clearly falls within the provision's grasp." 135 S. Ct. at 2557, 2561. We need not delve too deeply into the standing requirements for an as-applied challenge, however, because a thorough review of the record both at the district court and on appeal demonstrates Harris has maintained a facial challenge to the residual clause throughout and we resolve his challenge on that ground. See Appellant's Cross-Petition for Review, 6 ("K.S.A. 21-6304 is unconstitutionally vague, in general and as applied to Mr. Harris."); Appellant's Brief, 25 ("K.S.A. 21-6304 is vague in general and as applied to Mr. Harris"); Appellant's Reply Brief, 12 ("Mr. Harris' appellate brief argued that the residual clause of K.S.A. 21-6304 [c][1] is vague both in general and as applied to Mr. Harris' pocketknife."); Appellant's Reply Brief, 15

6

("this Court should now find the law void for vagueness both as applied to Mr. Harris and generally").

In doing so, we are engaged in questions of statutory interpretation and constitutional law. We exercise plenary review over each. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019) ("We review issues of statutory interpretation de novo.); *Creecy v. Kansas Dep't of Revenue*, 310 Kan. 454, 462, 447 P.3d 959 (2019) ("The constitutionality of a statute is a matter of law subject to unlimited review.").

The Court of Appeals correctly recited the general standard governing Harris' vagueness challenge. The challenged statute must clear two distinct—albeit relatively low—hurdles. One hurdle is grounded in the due process requirements of the Fourteenth Amendment. The other in the doctrine of separation of powers emanating from both our federal and state constitutions. On the one hand, a "statute that 'either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application' violates the Fourteenth Amendment to the United States Constitution and is thus void for vagueness." *State v. Richardson*, 289 Kan. 118, 124, 209 P.3d 696 (2009). On the other hand, the law must "provide explicit standards for those who apply them" or it will amount to an "impermissibl[e] delegat[ion]" of "basic policy matters" by the legislative branch to "policemen, judges, and juries for resolution on an *ad hoc* and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972); see also *State v. Ingham*, 308 Kan. 1466, 1483, 430 P.3d 931 (2018) (Stegall, J., concurring) ("Vague laws give police officers, prosecutors, judges, and juries the authority to decide what the law is on an *ad hoc* basis—all without the political accountability inherent in the legislative process."). Finally, the need to prevent "arbitrary and discriminatory enforcement is heightened for criminal statutes because criminal violations result in the loss of personal liberty." *Richardson,* 289 Kan. at 125.

Most litigation concerning vagueness in statutes has tended to focus on the due process elements of the vagueness doctrine. Does the statute fairly put people on notice as to the conduct proscribed? Are the words used common and understandable enough to allow persons of ordinary intelligence to easily grasp their meaning? This hurdle is often described as requiring no more than a "'commonsense determination of fundamental fairness.'" 289 Kan. at 124. This should be no surprise given that this analysis springs from the constitutional requirements of due process. And when the analysis is confined to these questions, the rationale of the Court of Appeals panel—as well as the dissent—is understandable. The statute bars possession of knives by convicted felons. A pocketknife is a knife. People of ordinary intelligence are on notice as to what conduct the statute restricts, and the demands of fundamental fairness are met.

But our focus today is on the second hurdle—the one intended to ensure that the Legislature has not impermissibly delegated its authority to write the laws to officials or actors in either the executive or judicial branches of government. We hold that the residual clause of K.S.A. 2019 Supp. 21-6304 cannot clear this hurdle. The primary problem with a law that fails to "provide explicit standards" for enforcement (as required by the Court in *Grayned*) is that such laws "invite arbitrary power." *Sessions v. Dimaya*, 584 U.S. ___, 138 S. Ct. 1204, 1223, 200 L. Ed. 2d 549 (2018) (Gorsuch, J., concurring). That is, these laws "threaten to transfer legislative power to" police, prosecutors, judges, and juries, which leaves "them the job of shaping a vague statute's contours through their enforcement decisions." 138 S. Ct. at 1228 (Gorsuch, J., concurring).

Because an impermissible delegation of legislative power will often lead to arbitrary enforcement based on subjective or even prejudicial criteria, the United States Supreme Court has indicated that the "more important" prong of the "vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' [Without these], a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors,

8

and juries to pursue their personal predilections.' [Citations omitted.]" *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983); see also *United States v. Davis*, 588 U.S. __, 139 S. Ct. 2319, 2325, 204 L. Ed. 2d 757 (2019) ("Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide."); *United States v. Reese*, 92 U.S. 214, 221, 23 L. Ed. 563 (1875) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government.").

It is the very overbreadth of such laws that renders them impermissibly vague. It is not necessarily because they are ambiguous on their face—an overbroad law can be very clear. The problem, in fact, may be amplified by clarity. If a law "makes everyone" a violator, then "prosecutors and the police [will] both define the law on the street and decide who has violated it." Stuntz, *The Pathological Politics of Criminal Law*, 100 Mich. L. Rev. 505, 511 (2001). This is a world in which "almost anyone can be arrested for something." *Nieves v. Bartlett*, 587 U.S. ___, ___, 139 S. Ct. 1715, 1730, 204 L. Ed. 2d 1 (2019) (Gorsuch, J., concurring in part and dissenting in part).

It is appropriate to call such clear-but-overbroad laws "vague" because by failing to provide adequate enforcement guidelines, the Legislature has left it up to other actors to give the law teeth through their enforcement decisions and actions. As Justice Robert Jackson once wrote, without clear legal standards to guide us, we human beings "usually end up . . . condemning all that we personally disapprove and for no better reason than that we disapprove it." *Jordan v. De George*, 341 U.S. 223, 242, 71 S. Ct. 703, 95 L. Ed. 886 (1951) (Jackson, J., dissenting). Within constitutional boundaries, legislators have this liberty. This is by design. Prosecutors, judges, law enforcement officers, and juries—that is, actors constrained by the law—do not have such freedom. This, too, is by design.

9

Whether or not a person is arrested, charged, and convicted for violating a law must depend more on objective and discernable legal rules than on the mere discretion, guesswork, or whim of government officials. See *Davis*, 139 S. Ct. at 2325 ("Only the people's elected representatives in the legislature are authorized to 'make an act a crime.'").

In the past, we have considered whether a noise ordinance was unconstitutional because it violated these separation of powers principles. In *City of Lincoln Center v. Farmway Co-Op, Inc.*, 298 Kan. 540, 546, 316 P.3d 707 (2013), we considered the City's ordinance that criminalized the making of "'any excessive, unnecessary, unreasonable or unusually loud noise which either annoys, disrupts, injures or endangers the comfort, repose, health, peace or safety of others within the City.'" We held this language "fails the second prong of the vagueness inquiry" because it failed to "'convey sufficient clarity to those who apply the ordinance standards to protect against arbitrary and discriminatory enforcement.'" 298 Kan. at 549 (quoting *City of Wichita v. Hackett*, 275 Kan. 848, 856, 69 P.3d 621 [2003]).

In reaching this conclusion, we considered the difficulty facing those charged with enforcing this noise ordinance. How would they know for sure whether a noise was excessive or unnecessary, or whether it annoyed or disrupted the comfort of others? Because of the highly subjective nature of these judgments, we concluded enforcement would be "varying and . . . unpredictable." 298 Kan. at 549. We ultimately described this type of vagueness problem as "an impermissible delegation of basic policy matters" by the legislative branch to actors in other branches of government for "'resolution on an ad hoc and subjective basis.'" 298 Kan. at 549 (quoting *Hackett*, 275 Kan. at 854).

Today's case gives us a textbook example of the same kind of enforcement guesswork that can result from a vague law. The statute makes it a crime for Harris to possess a weapon. K.S.A. 2019 Supp. 21-6304. A weapon "means a firearm or . . . a

10

dagger, dirk, switchblade, stiletto, straight-edged razor or any other dangerous or deadly cutting instrument of like character." K.S.A. 2019 Supp. 21-6304(c)(1), (2). It is undisputed that Harris did not possess a firearm, a dagger, a dirk, a switchblade, a stiletto, or a straight-edged razor. In these circumstances, enforcement officials must ask, what exactly is a dangerous cutting instrument of like character? We are unable to discern a sufficiently objective standard of enforcement in this language. Instead, we are left with the subjective judgment of the enforcement agencies and actors. A pair of scissors? Maybe. A safety razor blade? Perhaps. A box cutter? Probably, but would that decision be driven by an objective rule or a historically contingent fear of box cutters? See *Johnson*, 135 S. Ct. at 2557 ("We are convinced that the indeterminacy of the wide-ranging inquiry required by the residual clause . . . invites arbitrary enforcement.").

The dissent chides us for reciting these hypothetical examples, though in doing so it issues its own subjective interpretation of what *really* counts as a knife. The dissent goes so far as to attempt to distinguish between the relative deadliness of the cutting edges on a box cutter (prohibited) and a pair of scissors (not prohibited). Slip op. at 19. But the statutory language at issue—"dangerous or deadly cutting instruments of like character"—does not permit such fine distinctions.

Fortunately for our analysis, we are not limited to speculation about hypothetical cutting objects, or even to the question of whether Harris' pocketknife is or isn't a "dangerous or deadly cutting instrument[] of like character." That discussion—including the photograph of the knife included in the dissent—is irrelevant to the crucial question presented by this case. Namely, does K.S.A. 2019 Supp. 21-6304 invite "varying and . . . unpredictable" enforcement decisions "on an ad hoc and subjective basis?" *Farmway Co-Op, Inc.*, 298 Kan. at 549.

And we do not have to speculate on the answer to this question. Here we have a concrete example of government officials expressing and operating under diametrically

11

opposed, yet plausible, enforcement standards—a sure sign of subjectivity in action. The State of Kansas, through its prosecutors, believes (and has acted on its belief) that K.S.A. 2019 Supp. 21-6304 is meant to be enforced against Harris and his pocketknife. But the State of Kansas has also, through its Department of Corrections, published a handbook and advised parolees (including Harris) that K.S.A. 2019 Supp. 21-6304 is not meant to be enforced against Harris and his pocketknife. Even without any bad faith on the part of the government—and the record here gives us no reason to suspect there is—the circumstances present us with an unmistakable instance of arbitrary enforcement of an inherently subjective standard.

In our considered judgment, this constitutional failure begins with a legislative enactment that has impermissibly delegated legislative power to the executive and judicial branches. Thus, we hold that the residual clause in K.S.A. 2019 Supp. 21-6304 is unconstitutionally vague. Harris' conviction must be reversed and his motion to dismiss granted.

The judgment of the Court of Appeals is reversed. Harris' conviction is reversed, and this case is remanded to the district court with instructions to dismiss the charge of criminal possession of a weapon by a convicted felon.

HENRY GREEN, JR., J., assigned.[1]
STEVE LEBEN, J., assigned.[2]

---

[1]**REPORTER'S NOTE:** Judge Green, of the Kansas Court of Appeals, was appointed to hear case No. 116,515 under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.

[2]**REPORTER'S NOTE:** Judge Leben, of the Kansas Court of Appeals, was appointed to hear case No. 116,515 under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

BILES, J., dissenting:  The "pocketknife" in this case features a sharp, serrated blade, 3 and 1/2 inches long, that folds back into its handle. It is about 7 inches long fully extended. And even though the oversized bowie knife of Crocodile Dundee movie fame dwarfs it by comparison, it cannot reasonably be mistaken as something outside the foreseeable statutory meaning of "knife" in a measure designed to keep convicted felons from possessing a weapon. K.S.A. 2019 Supp. 21-6304 is not unconstitutionally vague on its face or as applied to Harris. I dissent because the majority's decision inappropriately conjures facts not supported by the record, while improperly drifting past the undisputed facts in favor of hypotheticals. And by doing this, the majority imposes too strict of a standard on the Legislature's ability to formulate criminal laws by now requiring "an explicit and objective standard of enforcement." *State v. Harris*, No. 116,515, Syl.

That said, Christopher Harris may still prevail. In my view, he is entitled to pursue the mistake-of-law defense denied to him by the district court. I would reverse his conviction on that basis and return this case to the district court for a new trial.

## THE STATUTE'S CONSTITUTIONALITY

The jury found Harris violated K.S.A. 2019 Supp. 21-6304, which forbids convicted felons from possessing weapons under certain circumstances. The statute defines "'weapon'" as "a firearm or a knife." K.S.A. 2019 Supp. 21-6304(c)(2). And it defines "'knife'" as "a dagger, dirk, switchblade, stiletto, straight-edged razor *or any other dangerous or deadly cutting instrument of like character*." (Emphasis added.) K.S.A. 2019 Supp. 21-6304(c)(1). This pretty plainly covers the knife Harris carried when he was arrested. See Attachment.

13

The circumstances of Harris' arrest make my point. He was apprehended after brandishing this knife during an argument on a street with another man. A police officer saw the two men's altercation, turned the patrol vehicle's spotlight on Harris, and when he did Harris dropped the knife to the ground. So while the majority and I fuss about what should be reasonably understood from the statutory language, it is apparent from these uncontroverted facts that Harris appreciated he was carrying something capable of injuring or killing someone and used it to threaten his adversary with that consequence. This is the classic, well-understood meaning of a "weapon." See Black's Law Dictionary 1908 (11th ed. 2019) (defining "weapon" as "[a]n instrument used or designed to be used to injure or kill someone").

Yet the majority holds the criminal-possession statute is unconstitutionally vague. It fears that without an "explicit and objective standard" for what kind of knife falls within the statutory meaning of "any other dangerous or deadly cutting instrument of like character," police acting in good faith can start arresting convicted felons with bread knives. No. 116,515, Syl., slip op. at 2 (casting doubt on the statute's constitutionality by suggesting bread knives are "universally referred to as a knife"; holding K.S.A. 2019 Supp. 21-6304 is unconstitutionally vague as it "fails to provide an explicit and objective standard of enforcement"). To reach that holding, the majority changes the judicial lens through which we view these questions. And its methods and rationale open new opportunity for judicial oversight that will hamstring the Legislature's ability to draft criminal laws.

Most egregiously, the majority moves the goalposts for deciding this case without giving the State a fair chance to brief and argue what has turned out to be the determinative question the majority wants to answer, i.e., whether the statute can survive a general, facial challenge. The majority states "a thorough review of the record both at the district court and on appeal demonstrates Harris has maintained a facial challenge to the residual clause throughout and we resolve his challenge on that ground." Slip op. at 6.

14

But the majority carefully avoids reciting any portion of the district court record when it claims Harris maintained a facial challenge throughout because its assertions are not accurate. For example, as Harris specified in his second motion to dismiss, "The basis for the Motion is that the offenses alleged against Defendant rely upon K.S.A. 21-6304[c][1] [and] [2] and that *when those sections are applied to this case* they are unconstitutionally overbroad and vague." (Emphasis added.); see, e.g., *State v. Harris*, No. 116,515, 2018 WL 473605, at *4 (Kan. App. 2018) (unpublished opinion) ("Harris claims his conviction must be vacated, however, because the broad definition of knife set forth in K.S.A. 2014 Supp. 21-6304[a][2] is unconstitutionally vague as applied to him."); Transcript of Pretrial Motions, March 1, 2016, at p. 26 ("Court:  [I] don't think as it applies to Mr. Harris that this statute is void for vagueness."). The State can fairly cry foul on this one, especially when the result is a statute being struck down as unconstitutional based on a newly minted criteria requiring "an explicit and objective standard of enforcement." See slip op. at 1, Syl. ; Supreme Court Rule 7.06 (2020 Kan. S. Ct. R. 49).

Typically, courts describe the standard of review when addressing a criminal defendant's vagueness challenge along the following familiar parameters:

> "Whether a statute is constitutional is a question of law subject to unlimited review. This court presumes that statutes are constitutional and resolves all doubts in favor of passing constitutional muster. If there is any reasonable way to construe a statute as constitutionally valid, this court has both the authority and duty to engage in such a construction.

> "A statute is unconstitutionally vague if it fails to give adequate warning of the proscribed conduct, that is to say, that it '"fails to provide a person of ordinary intelligence fair notice of what is prohibited."' A statute is also unconstitutionally vague if it fails to protect against arbitrary enforcement. Violation of either aspect of these predictability requirements is grounds for invalidating a statute.

15

"Thus, the test to determine whether a criminal statute is so vague as to be unconstitutional entails two related inquiries: (1) whether the statute gives fair warning to those potentially subject to it, and (2) whether it adequately guards against arbitrary and unreasonable enforcement. 'At its heart the test for vagueness is a commonsense determination of fundamental fairness.'[Citations omitted.]" *State v. Bollinger*, 302 Kan. 309, 318, 352 P.3d 1003 (2015).

But much of this is missing from the majority's rationale. Gone is the presumption of constitutionality generally afforded legislative enactments, as well as the guidepost for commonsense determinations of fundamental fairness. The majority instead transforms the arbitrary enforcement component into an overly exacting search for statutory precision. Slip op. at 7-10. In doing so, the majority considers hypothetical scenarios in which an imaginary felon might be prosecuted for possessing a pair of scissors, a safety razor blade, or a bread knife.

This analysis is untethered from the circumstances of Harris' case and that has not been the way we have previously assessed similar vagueness challenges. We have looked instead to the particular facts of the case, but not other circumstances born from the imagination. See, e.g., *State v. McLinn*, 307 Kan. 307, 345, 409 P.3d 1 (2018) (when addressing as-applied constitutional challenges, courts do not consider conceivable circumstances other than the circumstance before the courts); *State v. Kee*, 238 Kan. 342, 352-53, 711 P.2d 746 (1985) (noting "a statute may be constitutional as applied to one set of facts and unconstitutional as applied to another"; rejecting the defendant's as-applied claim that the criminal statute's language of "'or induce official action'" was unconstitutionally vague; reasoning the particular facts of the case—"making of a written instrument, knowing it to falsely state some material matter with intent to induce official action by a bank examiner"—was "clearly outlawed by the statute"). See generally *Hainline v. Bond*, 250 Kan. 217, 226, 824 P.2d 959 (1992) ("The vagueness challenge here must be a limited one. The United States Supreme Court has repeatedly stated, '[V]agueness challenges to statutes which do not involve First Amendment freedoms

16

must be examined in the light of the facts of the case at hand.' This means that the statute is judged on an 'as-applied' basis.").

The directive to consider a statute's vagueness in the actual context of the facts should control. Courts decide whether a statute is vague as applied to the particular facts at issue because a litigant who engages in clearly proscribed conduct cannot complain about a law's vagueness as applied to someone else's conduct. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19, 130 S. Ct. 2705, 177 L. Ed. 2d 355 (2010); see *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988) ("[O]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk."); *Hearn v. City of Overland Park*, 244 Kan. 638, 639, 772 P.2d 758 (1989) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."). This principle runs so deep it can negatively impact a defendant's standing to even pursue the issue. See *State v. Williams*, 299 Kan. 911, 918, 329 P.3d 400 (2014) ("Generally, 'if there is no constitutional defect in the application of the statute to a litigant, [the litigant] does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations.'") (quoting *Ulster County Court v. Allen*, 442 U.S. 140, 155, 99 S. Ct. 2213, 60 L. Ed. 2d 777 [1979]); *Hearn*, 244 Kan. at 639 (dog owners who acknowledged their dogs were pit bulls lacked standing to challenge ordinance regulating pit bull ownership as vague); see also *City of Lincoln Center v. Farmway Co-Op, Inc.*, 298 Kan. 540, 548, 316 P.3d 707 (2013) (facial constitutional challenges should be disfavored).

*Bollinger*, 302 Kan. at 317-18, supplies an example of the appropriate analysis. The court held the term "any interest" in the arson statute was not unconstitutionally vague, despite defendant's claim the statute might permit an interpretation criminalizing almost any burning of property because "interests" might be "so attenuated as to be nonsensical." 302 Kan. at 317-18. The *Bollinger* court reasoned that applying the

17

statutory language to the defendant and his marital situation, as opposed to applying it "to an abstract defendant, the proscribed conduct does not lie in some fuzzy realm of speculation." 302 Kan. at 320. The court explained a reasonable interpretation of "any interest" implied an assertable legal interest in property. 302 Kan. at 320. It concluded the arson statute was clear enough to inform the defendant that setting fire to the house where his wife lived would constitute arson, and that his prosecution was not an arbitrary and discriminatory enforcement of the statute.

Analyzing K.S.A. 2019 Supp. 21-6304(c)(1) in light of the facts in Harris' case reinforces our two traditional analytical polestars: (1) the statute is sufficiently clear to have informed him it was unlawful to possess his knife, and (2) the statute is sufficiently clear to stave off any contention that authorities arbitrarily prosecuted him for having it. See *Bollinger*, 302 Kan. at 318 ("'At its heart the test for vagueness is a commonsense determination of fundamental fairness.'"); see also *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03, 86 S. Ct. 518, 15 L. Ed. 2d 447 (1966) ("It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case."). Put another way, *Harris'* conduct was clearly proscribed by this statute.

The criminal-possession statute makes clear not all objects with a blade are prohibited. It provides instead that "'[k]nife' *means* a dagger, dirk, switchblade, stiletto, straight-edged razor or any other dangerous or deadly cutting instrument of like character." (Emphasis added.) K.S.A. 2019 Supp. 21-6304(c)(1). This statutory description supplants the term's ordinary meaning. And the phrase with which we are concerned—"dangerous or deadly cutting instruments of like character" is given understandable dimension by the five listed items that precede it—dagger, dirk, switchblade, stiletto, and straight-edged razor.

18

When the Legislature decided to use the word "means" in defining "knife," it made that definition both complete and exclusive. And nothing can be added or deleted by interpretation. So the majority's hypothetical examples ("[a] pair of scissors and [a] safety razor blade") would be excluded from the Legislature's restrictive definition of "knife." See Garner's *Lexical and Stipulative Definitions*, Dictionary of Modern Legal Usage 257-58 (2d ed. 2001). Similarly, and as the majority seems to concede, its box cutter example may very well fit within the restrictive definition of "knife."

Nevertheless, the five descriptors provided are easily and reasonably understood to describe per se dangerous or deadly cutting instruments. The dictionary defines "dagger" as "a weapon with a short, pointed blade, used for stabbing"; "dirk" as "a long, straight dagger"; "switch-blade" as "a large jackknife that snaps open when a release button on the handle is pressed"; "stiletto" as "a small dagger, having a slender, tapering blade"; and "straight razor" as "a razor with a long, unguarded blade that can be folded into the handle." Webster's New World College Dictionary 372, 417, 1426, 1433, 1467 (5th ed. 2014). And this then carries through for the disjunctive phrase "or any other dangerous or deadly cutting instrument of like character," which is simply intended to prevent convicted felons from carrying a broader range of dangerous or deadly cutting instruments with features similar to those listed. Most importantly, the statutory language does not insert subjective judgment unmoored from the statute's specifics. Harris' knife—with its sharp, serrated, 3 and 1/2-inch blade that folds into its 4-inch handle—falls well within this statute's foreseeable bounds.

This conclusion is further supported by several decisions from our Court of Appeals on similar prosecutions. See *State v. Moore*, 38 Kan. App. 2d 980, 985-86, 174 P.3d 899 (2008) (stating defendant was convicted of an aggravated weapons violation for carrying a "dangerous knife"; holding the statutory term "'dangerous knife . . . or any *other* dangerous or deadly weapon or instrument of like character'" was not unconstitutionally vague as applied to the defendant's case when he carried a 3.5-inch

19

serrated blade); *State v. Baston*, No. 119,538, 2019 WL 5287914, at *2, 4 (Kan. App. 2019) (unpublished opinion) (stating defendant challenged the phrase "any other dangerous or deadly cutting instrument of like character"; holding the statute was not unconstitutionally vague when the knife at issue was "a machete with an 11-inch blade"); *State v. Purcell*, No. 102,659, 2010 WL 3488811, at *1, 4 (Kan. App. 2010) (unpublished opinion) (stating defendant was convicted of criminal use of weapons; holding the statutory language "'*any other dangerous or deadly weapon or instrument of like character*'" was not unconstitutionally vague as applied to the defendant when a weapon at issue was "a 6-inch long ice pick").

Harris should not be heard to complain, but the majority hears him anyway by discovering a facial challenge from Harris' as-applied one. In doing so, it considers whether the statute is so abstract on its face that it cannot help but invite arbitrary and discriminatory enforcement. This approach runs contrary to our caselaw.

Consider *Farmway*, 298 Kan. 540, which the majority cites with approval but actually illustrates my point. There, two municipal ordinances were under attack: a noise ordinance and a nuisance ordinance. The former was held to be unconstitutionally vague as applied to the defendant because it failed to "'convey *sufficient* clarity to those who apply the ordinance standards to protect against arbitrary and discriminatory enforcement.'" (Emphasis added.) 298 Kan. at 549 (quoting *City of Wichita v. Hackett*, 275 Kan. 848, 856, 69 P.3d 621 [2003]). But the court upheld the latter "because the agents enforcing the ordinance were not free to prosecute based on their own ad hoc and subjective judgments or unique feelings about the facility." 298 Kan. at 554.

Let's compare the language of the two ordinances and contrast the court's analysis in reaching the differing outcomes. At the outset, we should recognize the *Farmway* court acknowledged its duty to presume the ordinances' constitutionality as well as its duty, if possible, to preserve their validity and to search for a way to construe their defined

20

parameters as constitutional. 298 Kan. at 544. The majority, as noted, makes no similar acknowledgment.

The unconstitutional noise ordinance in *Farmway* provided:

> "'Section 1. DISTURBING THE PEACE. It is unlawful for any person to make, continue, maintain or cause to be made or continue any excessive, unnecessary, unreasonable or unusually loud noise which either annoys, disrupts, injures or endangers the comfort, repose, health, peace or safety of others within the City.'" 298 Kan. at 546.

The *Farmway* court held the enforcement uncertainty rendering the noise ordinance unconstitutionally vague came from its lack of any objective standard to make determinations for what would constitute noise that was "excessive," "unnecessary," or "unusually loud," which "disrupts" or "annoys" others in the city. 298 Kan. at 549 ("The ordinance's lack of objective standards for making these determinations readily promotes varying and somewhat unpredictable bases for enforcement."); see also *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971) ("Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, 'men of common intelligence must necessarily guess at its meaning.'").

In contrast, the *Farmway* court held the nuisance ordinance remained within constitutional boundaries. It provided:

> "'9.5 MAINTAINING PUBLIC NUISANCE. Maintaining a public nuisance is by act, or by failure to perform a legal duty, intentionally causing or permitting a condition to exist *which injures or endangers the public health, safety or welfare. . . .'*

21

"'9.6 PERMITTING PUBLIC NUISANCE. Permitting a public nuisance is knowingly permitting property under the control of the offender to be used to maintain a public nuisance, as defined in Section 9.5 of this article.'" (Emphasis added.) *Farmway*, 298 Kan. at 550.

The *Farmway* court noted that although "nuisance" is incapable of precise definition, municipalities were required to define it in light of the general understanding that it means "'that which annoys or causes trouble or vexation, that which is offensive or noxious, or anything that works hurt, inconvenience or damage.'" 298 Kan. at 551-52 (quoting *Hofstetter v. Myers, Inc.*, 170 Kan. 564, 568, 228 P.2d 522 [1951]). And the court concluded the ordinance's phrase "injures or endangers the public health, safety or welfare" was not too vague or subject to arbitrary enforcement ills. It reasoned the less defined terms "injures" and "endangers" were tied to the "public standard" implicit in the phrase "public health, safety or welfare." It explained:

> "[W]hile the public standard is not explicitly objective, it nevertheless protects against arbitrary enforcement because the enforcers must consider how the community is affected. In sum, *the ordinance was precise enough to adequately protect against arbitrary and discriminatory action by those tasked with enforcing it*." (Emphasis added.) 298 Kan. at 554.

In Harris' case, the majority's rationale distorts the second prong beyond a commonsense determination, as exemplified by *Farmway*. It says a criminal statute must "'provide explicit standards' for enforcement." Slip op. at 8 (quoting *Sessions v. Dimaya*, 584 U.S. ___, 138 S. Ct. 1204, 1223, 200 L. Ed. 2d 549 [2018] [Gorsuch, J., concurring]). This phrasing, of course, is generally rooted in the Supreme Court's vagueness jurisprudence, but its use in Harris' case by the majority demands an unequivocal clarity neither we nor the United States Supreme Court have previously called for. Make no mistake, new ground is being plowed here today.

In *Dimaya*, the Court held the language in 18 U.S.C. § 16(b) (2016), defining a crime of violence, was unconstitutionally vague. Section 16(b) described a crime of violence as "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." The Court concluded § 16(b) "'requires a court to picture the kind of conduct that the crime involves in "the ordinary case," and to judge whether that abstraction presents' some not-well-specified-yet-sufficiently-large degree of risk. The result is that § 16(b) produces . . . 'more unpredictability and arbitrariness than the Due Process Clause tolerates.'" *Dimaya*, 138 S. Ct. at 1216. Section 16(b) was held unconstitutionally vague because it required a judge to imagine a crime's ordinary case, to measure that crime's risk, and then to apply the substantial risk standard to that judge-imagined abstraction of an ordinary case.

But that is not what is happening in Harris' prosecution. The criminal-possession statute is sufficiently clear to avoid *Dimaya*'s concerns—"police, prosecutors, judges, and juries" are not required to imagine what a "dangerous or deadly cutting instrument of like character" to the enumerated examples is under K.S.A. 2019 Supp. 21-6304(c)(1). Slip op. at 8. Consider *Farmway*'s nuisance ordinance again. If the majority's new measure is a requirement that all unlawful activity be explicitly and objectively defined, where is that precision when cities seek to protect their citizens against "intentionally causing or permitting a condition to exist which injures or endangers the public health, safety or welfare"?

If we embrace the majority's view, our standard for the appropriate degree of specificity is transformed from a requirement for commonsense adequate protections against arbitrary and discriminatory enforcement to an unbearably exacting requirement that all statutes making specific conduct criminal must be wholly expressed by the Legislature. This goes too far. See *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983) (The Court notes that the arbitrary enforcement prong of

23

the vagueness test demands "'that a legislature establish minimal guidelines to govern law enforcement.' Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" [Citations omitted.]).

The play in K.S.A. 2019 Supp. 21-6304(c)(1)'s statutory joints falls far short of what has moved the United States Supreme Court to invalidate statutes for inviting arbitrary enforcement. Patrolling this constitutional boundary, the Court has invalidated, for example, an ordinance prohibiting loitering, defined as remaining "'in one place with no apparent purpose'" because it gave "'absolute discretion to police officers to decide what activities constitute loitering.'" *Chicago v. Morales*, 527 U.S. 41, 61, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999). It also struck down a statute permitting a jury to assess court costs against any defendant when the statute "contain[ed] no standards at all, nor [placed] conditions of any kind upon the jury's power to impose costs upon a defendant who has been found by the jury to be not guilty of a crime . . . ." *Giaccio v. Pennsylvania*, 382 U.S. 399, 403, 86 S. Ct. 518, 15 L. Ed. 2d 447 (1966).

Yet the majority concludes subsection (c)(1) is impermissibly vague simply because it would be possible for different parties to reach inconsistent determinations about what objects are dangerous or deadly cutting instruments "of like character" to the listed examples. Slip op. at 9-10. But that does not mean the standards supplied by the statute give too much enforcement latitude. The United States Supreme Court "has consistently held that lack of precision is not itself offensive to the requirements of due process." *Roth v. United States*, 354 U.S. 476, 491, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957). And the *Roth* Court noted "it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system." 354 U.S. at 492 n.30; see also *State v. Randol*, 226 Kan. 347, 352, 597 P.2d 672 (1979) (adopting *Roth*'s rationale in addressing the statute's vagueness). And so even if it becomes a jury question whether a particular knife is

24

prohibited by the criminal possession statute that does not render the statute unconstitutional. See *State v. Baldwin*, 571 S.W.2d 236, 241-42 (Mo. 1978) (jury was justified in finding that steak knife was a dangerous and deadly weapon), *abrogated on other grounds by State v. Porter*, 439 S.W.3d 208 (Mo. 2014); *State v. Beckert*, 144 N.H. 315, 318, 741 A.2d 63 (1999) ("[A] reasonable jury could find that the [six-inch hunting] knife constituted a 'dangerous weapon.'"); *United States v. Brooks*, 330 A.2d 245, 247 (D.C. 1974) (holding the task of determining whether an object constituted a dangerous weapon was a proper one for the jury).

The majority further stretches the record past the breaking point by declaring the KDOC handbook is "a sure sign of subjectivity in action." Slip op. at 11-12. The majority's premise is that KDOC was interpreting *the* statute under which Harris was convicted. See slip op. at 12 ("But the state of Kansas has also, through its Department of Corrections, published a handbook and advised parolees [including Harris] that K.S.A. 2019 Supp. 21-6304 is not meant to be enforced against Harris and his pocketknife."). The majority then concludes from the handbook that "the circumstances present us with an unmistakable instance of arbitrary enforcement of an inherently subjective standard." Slip op. at 12. In other words, the majority wants the reader to believe the Sedgwick County District Attorney and KDOC both looked at the same statute and independently came to different legal conclusions about its scope, so the statute must be subject to arbitrary enforcement. Let's consider a far more likely reality.

The Kansas Department of Corrections Division of Community and Field Services Supervision Handbook that Harris was given, after explaining, "You are prohibited from owning, possessing or purchasing any firearms while on supervision with the KDOC," stated:

> "Other prohibited weapons may include brass knuckles, throwing stars, or any other
> weapon so defined in K.S.A. 21-6301 (criminal use of weapons). An ordinary pocket

25

knife with a blade no longer than 4 inches is *not* considered by law to be a dangerous knife, or a dangerous or deadly weapon or instrument."

The record is a little unclear about this part, but it appears Harris received the handbook in 2014. We at least know he entered a halfway house in May 2014. But the inconvenient truth for the majority's arbitrary enforcement premise is that the law changed in 2013 regarding criminal use of weapons. The 2013 change struck from K.S.A. 2012 Supp. 21-6301 the following language: "except that an ordinary pocket knife with no blade more than four inches in length shall not be construed to be a dangerous knife, or a dangerous or deadly weapon or instrument." See L. 2013, ch. 88, § 2. Note how that language parallels the handbook.

This simply means the handbook's exception derives from statutory language that was outdated when the handbook was given to Harris—and the outdated language was not even from the statute now challenged. And as I explain later, these circumstances would be proper areas of inquiry as part of Harris' mistake-of-law defense; but they do not provide an example of arbitrary enforcement of K.S.A. 2019 Supp. 21-6304 as the majority claims. Slip op. at 11-12 ("Here we have a concrete example of government officials expressing and operating under diametrically opposed, yet plausible, enforcement standards—a sure sign of subjectivity in action.").

In my view, the appearance of Harris' knife alone is sufficient to conclude the statute is not unconstitutionally vague as applied to him under either prong of the test, which should answer the constitutional question the appellant asked us to resolve. And the statute is not facially vague as the majority concludes. See *People v. Gross*, 830 P.2d 933, 935, 937-38 (Colo. 1992) (holding the statutory definition of a knife—"any other dangerous instrument capable of inflicting cutting, stabbing, or tearing wounds"—was not void for vagueness because "there is a need for some generality in describing weapons that can be wielded as knives," and "persons are able to evaluate whether an

26

object is capable of inflicting cutting, stabbing, or tearing wounds"); *L.B. v. State*, 700 So. 2d 370, 372-73 (Fla. 1997) (holding term "common pocketknife" was not unconstitutionally vague because "in the vast majority of cases, it will be evident . . . whether one's pocketknife is a 'common' pocketknife under any intended definition of that term."). The heart of the two-prong test "'for vagueness is a commonsense determination of fundamental fairness.'" *Bollinger*, 302 Kan. at 318. Indeed, as noted earlier, Harris himself considered this knife a weapon he needed for protection in the incident that led to his arrest.

Finally, the majority cites *Johnson v. United States*, 576 U.S. 591, 135 S. Ct. 2551, 2557, 192 L. Ed. 2d 569 (2015), in support of its holding that K.S.A. 2019 Supp. 21-6304 invites arbitrary enforcement. Slip op. at 11. But *Johnson* is surely distinguishable from Harris' case. The *Johnson* Court considered the definition of a "violent felony" under the Armed Career Criminal Act of 1984, which forbids certain people—such as convicted felons—to ship, possess, and receive firearms. 135 S. Ct. at 2555. In general, the law punishes violations by up to 10 years' imprisonment. But if a violator has three or more earlier convictions for a "serious drug offense" or a "violent felony," ACCA increases punishment to imprisonment for a minimum of 15 years and a maximum of life. 135 S. Ct. at 2555. The federal statute defines "violent felony" as follows:

> "any crime punishable by imprisonment for a term exceeding one year . . . that—
>
> "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> "(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves *conduct that presents a serious potential risk of physical injury to another*." (Emphasis added.) 18 U.S.C. § 924(e)(2)(B).

27

Subsection (i) asks whether the crime "has an element the use . . . of physical force," and subsection (ii)—the highlighted "residual clause"—"asks whether the crime 'involves conduct' that presents too much risk of physical injury." *Johnson*, 135 S. Ct. at 2557.

While addressing the vagueness issue, the Court majority noted "the inclusion of *burglary* and *extortion* among the enumerated offenses preceding the residual clause confirms that the court's task also goes beyond evaluating the chances that the physical acts that make up the crime will injure someone." (Emphases added.) 135 S. Ct. at 2557. Particularly, "[t]he act of making an extortionate demand or breaking and entering into someone's home does not, in and of itself, normally cause physical injury." 135 S. Ct. at 2557.

The Court further stated, "'[t]he phrase "shades of red," standing alone, does not generate confusion or unpredictability; but the phrase "fire-engine red, light pink, maroon, navy blue, or colors that otherwise involve shades of red" assuredly does so.'" 135 S. Ct. at 2561. In its view, burglary and extortion were navy blue, so the residual clause—"or otherwise involves conduct that presents a serious potential risk of physical injury to another"—did generate confusion or unpredictability.

In Harris' case, we do not have a "navy-blue" problem. None of the enumerated knives constitute an outlier, unlike *Johnson*, that do not share the common features of a dangerous or deadly cutting blade with a handle. So even assuming Harris' claim was based upon the facial ground, under *Johnson*'s rationale, the statute is not unconstitutionally vague on its face. As the *Johnson* Court acknowledged: "[W]e do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree[.]'" 135 S. Ct. at 2561.

28

Yet today's majority now imposes a criteria that insists on "an explicit and objective standard of enforcement." No. 116,515, Syl.

I dissent from the majority's holding. K.S.A. 2019 Supp. 21-6304(c)(1) is not unconstitutionally vague in general or as applied to Harris. Next, I consider Harris' mistake-of-law defense that the district court denied him.

### THE MISTAKE-OF-LAW DEFENSE

A Court of Appeals panel reversed Harris' conviction and remanded the case for a new trial, holding the district court committed reversible error by excluding evidence supporting his mistake-of-law defense. *Harris*, 2018 WL 473605, at *8. I agree with the panel's outcome, although I differ in how I process the issue. Some additional detail is necessary.

After Harris' arrest, the State charged him with aggravated assault, criminal possession of a weapon by a convicted felon, and criminal use of weapons. Harris testified he feared for his life during the altercation and brandished the knife for his protection. In pretrial proceedings, the district court prevented Harris from presenting evidence concerning a letter his parole officer, Alexis Olave, wrote after his arrest, stating: "[Y]ou are allowed to have a pocket knife less than 4 inches in length while on post release. However, if the pocket knife is used in a threatening manner, then it can be viewed as a violation or as a crime."

The court also denied him the ability to introduce a Kansas Department of Corrections Division of Community and Field Services Supervision Handbook in which it was stated: "An ordinary pocket knife with a blade no longer than 4 inches is *not* considered by law to be a dangerous knife, or a dangerous or deadly weapon or instrument." Finally, the court would not allow Harris to testify that: "I went to [s]tate

29

orientation just a couple of months before this, the whole place told me, everybody at that place told me and they give me that [handbook] stating and they told me I could own that knife." For purposes of appeal, the court put the letter, the handbook, and Harris' proffered testimony into the record.

A jury convicted Harris of criminal possession of a weapon but acquitted him of the other two charges. The court granted a dispositional departure to probation, finding Harris was complying with the guidance of his parole officer, who told him he could carry a pocketknife.

The mistake-of-law statute provides:

"A person's reasonable belief that such person's conduct does not constitute a crime is a defense if . . . such person acts in reliance upon an official interpretation of the statute, regulation or order defining the crime made by a public officer or agency legally authorized to interpret such statute." K.S.A. 2019 Supp. 21-5207(b)(4).

In reversing Harris' conviction, the panel applied the statute straightforwardly. It first determined a parole officer is a public officer under K.S.A. 2016 Supp. 21-5111(aa)(5) (public officer includes law enforcement officer) and K.S.A. 2016 Supp. 21-5111(p)(2) (law enforcement officer includes any KDOC officer and employee), and that the KDOC is an administrative agency. *Harris*, 2018 WL 473605, at *6. It next considered whether Olave and the KDOC were legally authorized to interpret the term "weapon" as used in the criminal-possession statute. 2018 WL 473605, at *7. The panel discussed two cases specifically addressing the official-interpretation defense under K.S.A. 2018 Supp. 21-5207(b)(4): *State v. V.F.W. Post No. 3722*, 215 Kan. 693, 527 P.2d 1020 (1974), and *State v. Jenkins*, 272 Kan. 1366, 39 P.3d 47 (2002). *Harris*, 2018 WL 473605, at *7. The panel reviewed statutes declaring a list of duties and powers of parole officers, the KDOC, and the KDOC Secretary: K.S.A. 75-5216 (parole officer's

30

duties), K.S.A. 2016 Supp. 75-5217(a), (b) (parole officer's power), K.S.A. 75-5201 (KDOC's purposes; Secretary's duties), K.S.A. 2016 Supp. 75-5217(a) (Secretary's power). 2018 WL 473605, at *6.

The panel determined parole officers and the KDOC were legally authorized to interpret the statute, and Olave's statement and the handbook were official interpretations. Therefore, it held the district court erred by excluding the relevant evidence. *Harris*, 2018 WL 473605, at *7-8. It primarily relied on *V.F.W. Post No. 3722*, 215 Kan. at 698 (stating K.S.A. 2019 Supp. 21-5207[b][4] would apply to "'cases involving executive action such as opinions of the attorney general and of the heads of other enforcement agencies'"), and K.S.A. 75-5201 (declaring one of the purposes of the KDOC is to educate convicted felons for reentry into the community). Finally, the panel concluded the State failed to meet its burden to demonstrate the error was harmless. 2018 WL 473605, at *8.

Although I get to the same outcome as the panel, my problem with its approach stems from the facts relating to Harris' claims of reliance. To my thinking, the panel incorrectly concluded Harris relied on the letter and treated Olave's statement as her personal interpretation of the statute. See *Harris*, 2018 WL 473605, at *5-8. Neither conclusion is supported by the record.

To begin with, as a part his proffer, Harris said he relied on Olave's advice during his parole orientation provided *prior to* the incident causing his arrest. And Harris said he relied on the handbook as confirmation for what he had been told earlier. In other words, he sought to show Olave's advice was not her personal interpretation of the statute, but rather the KDOC's official stance as reflected in the handbook that she was parroting. Harris insisted he believed her because when he attended the state orientation, "everybody at that place told me and they give me that [handbook] stating . . . I could

31

own that knife." Harris said he believed Olave's advice because it was consistent with the handbook. This, at least, implies he trusted the handbook as an official interpretation.

So while I agree with the panel that Olave was a public officer under our statutes, she was only a messenger for the KDOC's interpretation—not her own. From my perspective, the panel pulled at the wrong loose thread in analyzing whether Olave's letter and advice could support a mistake-of law-defense. 2018 WL 473605, at *6-8. The real issues are: (1) whether the KDOC would be legally authorized to interpret the criminal-possession statute, and, if so (2) whether the handbook could contain its official interpretation of the statute. The answer is yes to both inquiries, even though KDOC may not have updated its handbook.

As to the first question, K.S.A. 2016 Supp. 75-5217 appears to support the panel's holding that the KDOC is authorized to interpret criminal law. In addition to its duty under K.S.A. 75-5201 to "rehabilitate, train, treat, educate and prepare" convicted felons, like Harris, for their reentry into the community, the Secretary is allowed to issue a warrant for a parolee's arrest for violating a condition of release and a notice to appear to answer to a charge of violation. K.S.A. 2016 Supp. 75-5217(a) (Secretary's power to issue a warrant and a notice), (h) (parolee is under the supervision of the KDOC Secretary). And a violation can result from a conviction for a new felony or misdemeanor. K.S.A. 2016 Supp. 75-5217(c)-(d); see also K.S.A. 2019 Supp. 21-6304(b) ("Criminal possession of a weapon by a convicted felon is a severity level 8, nonperson felony."). Under K.S.A. 75-5216, a KDOC parole officer has a duty to furnish each parolee released under KDOC supervision a written statement of the conditions of parole and give instruction regarding those conditions.

Considering chapter 75, article 52 of the Kansas statutes as a whole, and particularly the provisions mentioned above, I conclude the KDOC is legally authorized

32

to interpret criminal statutes because it is necessarily required to interpret some criminal laws to perform its functions such as: (1) carrying out its duties to rehabilitate, train, educate, and prepare convicted felons for entry into the community, (2) exercising its authority to issue arrest warrants and notices to appear, and (3) furnishing parolees with written statements of conditions of parole. And if the KDOC is not legally authorized to interpret criminal statutes—especially when there is no prior judicial interpretation to the contrary—it would be practically impossible for it to carry out its duties and exercise its authority. However narrow its scope, those necessary functions clearly extend to interpreting K.S.A. 2019 Supp. 21-6304, because the statute exclusively governs convicted felons' conduct.

The KDOC distributed its handbook to encourage and assist offenders, including Harris, to become law-abiding citizens. This is in line with its K.S.A. 75-5201 obligations. Therefore, I conclude the KDOC was legally authorized to interpret K.S.A. 2019 Supp. 21-6304.

As to the second issue, the State claims the handbook "does not even purport to contain an official interpretation of the statute defining defendant's crime of conviction; rather, [it] simply explains the standard conditions of supervision." And to some extent, that is true, which reinforces my point. The handbook reads:

> "Conditions of Supervision:
>
> "While you are under supervision, you will be required to comply with the standard and special conditions of your release. The standard conditions are listed below along with a detailed explanation of each.
>
> "I acknowledge that I have been ordered and directed to:
>
> . . . .

33

"#3: Weapons

"Not own, possess or constructively possess, purchase, receive, sell or transport any firearms, ammunition or explosive device, or any device designed to expel or hurl a projectile capable of causing injury to persons or property, any instrument or tool used with the intent to cause harm, or *any weapon prohibited by law*.

". . . .

"Other prohibited weapons may include brass knuckles, throwing stars, or any *other weapon so defined in K.S.A. 21-6301 (Criminal use of weapon). An ordinary pocket knife with a blade no longer than 4 inches is* <u>*not*</u> *considered by law to be a dangerous knife, or a dangerous or deadly weapon or instrument*." (Emphases added.)

Admittedly, the handbook references K.S.A. 21-6301 (prohibiting knowingly possessing a "dangerous or deadly weapon" with intent to use it unlawfully against another), instead of K.S.A. 21-6304, which the challenged conviction here arises under. But it is difficult to accept the State's position that the handbook cannot be read by Harris to interpret K.S.A. 2019 Supp. 21-6304, which prohibits felons from possessing certain "dangerous or deadly cutting instrument[s]." This should be sorted out at trial.

The handbook directs offenders not to possess weapons "prohibited by law" and expressly assures them that "[a]n ordinary pocket knife with a blade no longer than 4 inches is not considered by law to be a dangerous knife, or a dangerous or deadly weapon or instrument." So even though the handbook's focus is on K.S.A. 21-6301 and not K.S.A. 21-6304, this caveat—drawn so closely to the language of K.S.A. 21-6304—could reasonably mean the KDOC did not believe possessing such an object would violate any standard parole condition or be "prohibited by law," which in this case are coextensive restrictions. See, e.g., K.S.A. 2016 Supp. 75-5217(c) (condition of release violation includes a conviction for a new felony).

34

Put simply, using the broad language of "by law" in describing what a prohibited weapon would be for released inmates, would give Harris the understanding that the KDOC was providing its official interpretation of criminal law—including the criminal-possession statute. And Harris not only claims he relied on the handbook, he points out he was "ordered and directed" to follow it.

I would hold the handbook could be read by Harris as containing the agency's official interpretation of the statute that served as the basis for Harris' conviction, so it was error not to allow him to pursue his mistake-of-law defense. This conclusion tees up the final question: whether the district court's error in excluding the evidence related to this defense was reversible.

I would conclude this error was not harmless because there is a reasonable probability the jury would have reached a different result if permitted to consider Harris' evidence tending to show he reasonably believed it was not a crime for him to possess the knife at issue. See *State v. Gilliland*, 294 Kan. 519, 542, 276 P.3d 165 (2012) ("when the issue relates to the application of a rule of evidence or procedure and not to a complete denial of a defense," an appellate court reviews an evidentiary error under the reasonable probability test). The excluded evidence is the sole proof supporting Harris' mistake-of-law defense. Without it, he had no chance to present his theory of defense.

The proffered evidence, if found credible by the jury, suggests Harris understood what was in the handbook, thought it applied to the knife he carried when he was arrested, and found the handbook reinforcing as to what he was told in orientation. To be sure, the sentencing court found Harris' explanation sufficient and persuasive when granting him a dispositional departure to probation. For these reasons, I would reverse Harris' conviction and remand the case to the district court for a new trial.

ROSEN, J., and GREEN, J., assigned, join the foregoing dissent.

