IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,782

STATE OF KANSAS,
*Appellee*,

v.

DZUNG N. NINH,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under the phrase "force or fear" in Kansas' rape and aggravated sodomy statutes, the actus reus is "to overcome" while the phrase "force or fear" merely describes a factual circumstance that may prove the victim was overcome. Thus, the entire provision "when the victim is overcome by force or fear" constitutes a single, unified means of committing the applicable sex offense.

2.

K.S.A. 21-5503(a)(1)(A), the statute defining rape when the victim is overcome by force or fear, is not rendered unconstitutionally vague by the subjective nature of the victim's state of mind or by subsection (e), which prohibits the accused from defending based on lack of knowledge of the victim's subjective state of mind. The statute gives fair notice of the prohibited conduct and articulates definite and precise standards capable of fair application, which necessarily guards against arbitrary interpretation and enforcement of the law.

1

3.

K.S.A. 21-5504(b)(3), the statute defining aggravated criminal sodomy when the victim is overcome by force or fear, is not rendered unconstitutionally vague by the subjective nature of the victim's state of mind or by subsection (f), which prohibits the accused from defending based on lack of knowledge of the victim's subjective state of mind. The statute gives fair notice of the prohibited conduct and articulates definite and precise standards capable of fair application, which necessarily guards against arbitrary interpretation and enforcement of the law.

Review of the judgment of the Court of Appeals in 63 Kan. App. 2d 91, 525 P.3d 767 (2023). Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Submitted without oral argument November 3, 2023. Opinion filed June 27, 2025. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, *Derek Schmidt*, former attorney general, and *Kris W. Kobach*, attorney general, were on the briefs for appellee.

PER CURIAM:  Dzung N. Ninh seeks review of the Court of Appeals decision affirming his multiple convictions for sexually abusing his teenage stepdaughter. A jury found Ninh guilty of one count of indecent liberties with a child, three counts of rape, and two counts of aggravated criminal sodomy. Ninh's cumulative sentences amount to life in prison. On direct appeal, Ninh challenged the sufficiency of the evidence to support his convictions, argued the Kansas rape and aggravated criminal sodomy statutes are unconstitutionally vague, claimed multiple instances of prosecutorial error affected the verdict, and asserted a violation of his right to a unanimous verdict based on the State's presentation of a "multiple acts" case. A Court of Appeals panel affirmed Ninh's convictions and rejected his constitutional and statutory challenges as well as his unanimity challenge. The panel also found one instance of prosecutorial error based on

2

the prosecutor's characterization of "grooming" as a type of force to facilitate the sex crimes in question. The panel found this was a misstatement of the law but concluded it did not affect the verdict so it was harmless error.

On review, Ninh argues the panel erred in rejecting his claims on appeal. The State filed a conditional cross-petition for review, arguing the panel erred by finding any prosecutorial error. For the reasons stated below, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Because Ninh challenges the sufficiency of the evidence, we must review the evidence presented at trial in some detail.

*Age 0-12*

T.V. was born in Vietnam and lived there for the first 12 years of her life. When she was about six years old, her mother immigrated to the United States, leaving T.V. and her younger biological sister behind in Vietnam to live with relatives. After moving to the United States, T.V.'s mother got remarried to Ninh, and they had two children together. When she was 12 years old, T.V. and her biological sister reunited with their mother and her new family in Kansas.

*Age 13*

Shortly after her 13th birthday, T.V. began spending a lot of time alone with Ninh, more so than her other siblings. She said her close relationship with Ninh involved a physical intimacy aspect that quickly escalated from him "hugging" her to him "touching" and "grabbing" parts of her body that made her uncomfortable. Having never had a father figure in her life, T.V. liked the attention, but did not like the physical

3

contact. At some point that summer when T.V. was sitting on Ninh's lap while Ninh was using his computer in the living room, T.V. remembered Ninh touched her breast over her clothing. Later that summer, Ninh touched T.V.'s breast under her shirt and bra.

Throughout eighth grade, Ninh touched T.V.'s breast about 15 to 20 times while the two were alone in the living room. Ninh would stop touching her if anyone else came into the room. Sometimes, T.V. would grab Ninh's hand, pull it away from her breast, and tell him to stop. Ninh also began touching her vagina when they sat together at the computer. She described how Ninh "cupped" his hand over her "private parts" and moved his fingers over her vagina, first outside her clothing and later underneath her underwear. When this first happened, T.V. testified that she grabbed Ninh's wrist, pulled his hand away, and "told him please don't do that." She estimated this form of touching occurred five or six times during her eighth-grade year and always at the computer in the living room. T.V. said Ninh told her not to tell anyone about how he touched her. She believed Ninh was monitoring her interactions with others and was afraid he would find out if she told anyone about it.

*Age 14*

By ninth grade, Ninh's abuse shifted from after school in the living room to late at night in the bedroom she shared with her younger sister. T.V. described how Ninh would come to her twin bed, lift up her comforter, rub his hands along her body, grab her breasts, then pull down her pajama pants and massage her vagina with his hands. When Ninh touched her vagina, he would run his fingers between the labia of her vagina. T.V. often considered telling her mother about the abuse, but decided against it out of fear that the family would break apart.

4

*Age 15*

Ninh continued touching T.V. in the same way throughout her sophomore year, with him touching her breast and inserting his fingers between the labia of her vagina. She said she began wearing a bra to bed at night in hopes of discouraging Ninh from touching her, as a form of "protection" and to show him she "didn't want this anymore." But Ninh would remove her bra if she was wearing one. Once her breasts were exposed to him, Ninh would "suck" on them. T.V. testified the vaginal touching continued throughout her entire sophomore year.

*Age 16*

T.V. testified that the same form of sexual abuse—inserting his fingers between the labia of her vagina and sucking on her breasts—continued into her junior year but that Ninh also began using his mouth on her vagina during this time. Ninh would spread T.V.'s legs apart to gain access to her vagina. She said when Ninh came to her room late at night and touched her breasts and vagina, she kept the comforter over her head so that she did not have to see what Ninh was doing.

T.V. testified the abuse became less frequent during her junior year, which she attributed to her meeting and growing close to her boyfriend later that school year. After her relationship with her boyfriend began, she estimated Ninh put his mouth on her vagina only once or twice. T.V. still had not disclosed the sexual abuse to her mother because she was afraid of what would happen to her family if she did.

*Age 17*

Early in her senior year, T.V. confided in her boyfriend about the nature of Ninh's abuse. He strongly encouraged T.V. to report the abuse but the thought terrified T.V. She

also told him she was afraid the same thing might happen to her younger sisters. At his urging, T.V. eventually wrote her mother a letter stating Ninh's "been touching me and I know I should have said this to you a long time ago but I was scared. I was afraid that this would do something to our family." In a follow-up conversation, T.V. told her mother that she did not want the touchings reported to police.

T.V. testified about one final act of sexual abuse against her by Ninh that occurred on September 7, 2017. Both T.V. and her boyfriend testified they arranged for him to witness by video chat the ways in which Ninh had been sexually abusing T.V. over the years. Her boyfriend devised the plan and presented it to T.V., explaining it would be a way to break her away from the abusive environment and "from feeling like she has to . . . live in fear that . . . she's just going to be woken up any time during the night and be touched again." Her boyfriend testified he had to persuade T.V. to go through with the plan because she was fearful and reluctant. He gave her tips on how to seduce Ninh. Although he admitted in hindsight the plan was a mistake, he justified it at the time because his younger brother had been molested when he was little, and he had always felt bad for not doing something about that abuse.

For her part, T.V. explained the suffocating rules and restrictions Ninh imposed on her were one motivating factor to carry out the plan. She also wanted her boyfriend to "know that this is what's going on and I don't like it" and to figure out a way to talk to her mom about it. Despite the plan to have him witness Ninh committing an act of sexual abuse consistent with those committed against her over the years, T.V. testified she did not expect Ninh to fully penetrate her vagina with his penis because that had never happened in the previous incidents.

> "Q. Okay. So you said that he pulled you from the dining room into the wood room. How does he pull you into that room?

6

"A. Well, he didn't exactly pull me. He grabbed my hand and he told me to come here. You know, I was—

"Q. You were compliant. You followed him. You walked with him?

"A. Yes.

"Q. Okay. After he has—he grabs you by the hand, asks you to come into the wood room with him and you do, what happens next?

"A. I don't remember. I don't remember a conversation that actually happened. I just knew that he started, like, grabbing my breast and touching me and do his—I guess what I would call his routine.

"Q. And describe those steps of his routine to us.

"A. He'll—he would lift up my shirt and he'll unhook my bra and he'll start grabbing my breast with his hand. And then for a while he started to, like, lean down and use his mouth on my breast and he'll, like, massage my vagina with his finger. And I did not expect what happened next. He took off his shirt and his pants and then he started to, like, pull me to the position where it's, I guess, easily accessible and then he penetrated me.

. . . .

"Q. Before September 7th, 2017, he had never put his penis in your vagina?

"A. No, he did not."

Later the next day, T.V.'s boyfriend told her mother what he witnessed, and T.V.'s mother called the police. Detective Chris Zandler of the Exploited and Missing Children's Unit testified that he interviewed T.V. on September 8, 2017, in the evening at the home. Highly summarized, T.V. described Ninh's sexual abuse as beginning in eighth grade and

involving touching her breast and vagina on top of her clothing, occurring up to "100" times; that by ninth grade, Ninh began coming into her room while she was sleeping and touching her under her clothes on her breast and vagina; and that during sophomore year, Ninh started using his mouth on her vagina, which continued throughout her junior year. Detective Zandler said T.V. reported Ninh raped her the day before, on September 7, 2017.

After the interview, T.V. underwent a sexual assault examination. The nurse conducted a full physical exam, including a forensic pelvic exam, and collected physical samples. The exam notes identified a yellow bruise on T.V.'s left breast and redness, bruising, swelling, abrasions, and lacerations on the labia and within the vaginal canal. The nurse assessed T.V.'s injuries as consistent with blunt force "penetrating" trauma.

Based on the results of its investigation, the State ultimately filed charges against Ninh on seven counts:

- Count I, aggravated indecent liberties with a child (age 13)
- Count II, rape (age 14)
- Count III, rape (age 14)
- Count IV, rape (age 15)
- Count V, aggravated criminal sodomy (age 15)
- Count VI, aggravated criminal sodomy (age 16)
- Count VII, rape (age 17).

At trial, Ninh did not deny a sexual encounter took place on September 7, 2017, but he argued it was consensual and had been set up by T.V. and her boyfriend because they were upset about the parental restrictions Ninh imposed on T.V. Ninh categorically denied the other incidents had happened, arguing T.V.'s testimony was not credible and

8

could not be verified by witnesses. The jury convicted Ninh of the first six counts but acquitted him of the seventh. The court sentenced Ninh to a hard 25 life sentence with 5 concurrent 165-month prison sentences.

ANALYSIS

Ninh raises four issues in his petition for review, and the State raises one in its conditional cross-petition. We have combined the parties' prosecutorial error challenges into a single, last issue. Thus, the four issues presented are: (1) whether Ninh's convictions were supported by sufficient evidence; (2) whether the rape and aggravated criminal sodomy statutes are unconstitutionally vague; (3) whether Ninh was deprived of his right to a unanimous verdict; and (4) whether the panel erred in finding prosecutorial error (State) and/or by concluding such error was harmless (Ninh).

I.  *Sufficiency of the Evidence*

A jury convicted Ninh of three counts of rape under K.S.A. 21-5503(a)(1)(A) and two counts of aggravated criminal sodomy under K.S.A. 21-5504(b)(3)(A). Both statutes prohibit a nonconsensual sex act with a victim who is "overcome by force or fear." Ninh argues the State failed to present sufficient evidence that T.V. was overcome by force or fear. Before addressing Ninh's sufficiency arguments, we must first resolve his challenge to the essential elements required to obtain a conviction under the rape and aggravated criminal sodomy statutes.

A.  *Essential Elements:  "Overcome by Force or Fear"*

Ninh claims there was insufficient evidence to support his convictions because the State only showed T.V. "submitted" to the acts charged as rape and sodomy. Although she may have been afraid in some sense, Ninh claims there was no evidence she was

9

*overcome* by that fear. In a novel legal argument, Ninh makes a distinction between the material element of "overcome" and the factual circumstances of "by force or fear" in the rape and sodomy statutes.

Ninh's argument requires us to interpret K.S.A. 21-5503 and K.S.A. 21-5504. Statutory interpretation is a question of law subject to de novo review. *State v. Eckert*, 317 Kan. 21, 27, 522 P.3d 796 (2023). The goal of statutory interpretation is to determine and give effect to the intent of the Legislature. To determine legislative intent, we look to the statute's plain language and give common words their ordinary meaning. If the statutory language is clear and unambiguous, there is no room for judicial construction and the clearly expressed intent of the Legislature must be given effect. 317 Kan. at 27.

We begin with K.S.A. 21-5503(a)(1), which defines rape as:

"(1) Knowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse under any of the following circumstances:

(A) When the victim is overcome by force or fear; or

(B) when the victim is unconscious or physically powerless."

As this court explained in *State v. Brooks*, 298 Kan. 672, 680, 317 P.3d 54 (2014), the rape statute is divided into paragraph subsections that define alternative means or actus reus of committing the overarching crime. But within each subsection, the language that describes or elaborates on the means is simply a manner of proving that material element. 298 Kan. at 680. Based on the structure of the rape statute, this court held the entire provision "[w]hen the victim is overcome by force or fear" constitutes a single, unified means of committing the applicable sex offense: the material element of rape

10

under subsection (A) is the actus reus "to overcome," while the phrase "by force or fear" "merely describes a factual circumstance that may prove" the victim was overcome. 298 Kan. at 681, 684 (citing *State v. Brown*, 295 Kan. 181, 196-97, 284 P.3d 977 [2012]).

The same construction applies to the Kansas aggravated criminal sodomy statute, K.S.A. 21-5504, which uses identical phrasing to the rape statute and prohibits similar conduct. *State v. Pepper*, 317 Kan. 770, 778, 539 P.3d 203 (2023). Like the rape statute, the aggravated criminal sodomy statute, K.S.A. 21-5504(b), sets out a broad description of nonconsensual sodomy and then lists three ways to commit the crime:

> "(3)  [S]odomy with a victim who does not consent to the sodomy or causing a victim, without the victim's consent, to engage in sodomy with any person or an animal under any of the following circumstances:
>
> (A)  When the victim is overcome by force or fear;
>
> (B)  when the victim is unconscious or physically powerless; or
>
> (C)   when the victim is incapable of giving consent because of mental deficiency or disease, or when the victim is incapable of giving consent because of the effect of any alcoholic liquor, narcotic, drug or other substance, which condition was known by, or was reasonably apparent to, the offender."

Just as with rape, the actus reus of this form of aggravated criminal sodomy is a nonconsensual sex act with a victim who is "overcome," and the phrase "by force or fear" describes the factual circumstances by which a victim is overcome to facilitate sodomy. See *State v. Burns*, 295 Kan. 951, 963-64, 287 P.3d 261 (2012) (explaining that subsection paragraphs separated by semi-colons create alternative means of committing sodomy while modifying language *within* a subsection paragraph presents "various factual circumstances that would prove the crime"), *overruled on other grounds by State v. King*, 297 Kan. 955, 305 P.3d 641 (2013).

11

Thus, under this court's existing precedent, a defendant's rape conviction under K.S.A. 21-5503(a)(1)(A) and aggravated criminal sodomy conviction under K.S.A. 21-5504(b)(3)(A) will be affirmed on appeal "when the jury was instructed that it must find that the victim was overcome by force or fear and evidence of either force or fear was presented at trial." *Brown*, 298 Kan. at 684. The plain statutory language requires nothing more, and we decline to read other language into the statutes or assign a judicial definition or standard to any of the challenged statutory terms.

### B. *Sufficiency of the Evidence that T.V. Was Overcome by Fear*

When a defendant challenges the sufficiency of the evidence supporting a criminal conviction, an appellate court reviews the evidence presented at trial in a light most favorable to the prosecution to determine whether it is convinced a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Roberts*, 314 Kan. 835, 849-50, 503 P.3d 227 (2022). Appellate courts are not to "'reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" 314 Kan. at 850. Thus, we will only reverse a guilty verdict for insufficient evidence when the testimony is so incredible that no reasonable fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

Under the rape statute, K.S.A. 21-5503(a)(1)(A), the State needed to prove Ninh knowingly engaged in sexual intercourse with T.V., without her consent, when she was overcome by either force or fear. Similarly, the State's burden under the aggravated criminal sodomy statute, K.S.A. 21-5504(b)(3)(A), was to prove Ninh engaged in sodomy with T.V., without her consent, when she was overcome by either force or fear. The parties have framed the issue as one of fear, not force. Because Ninh does not

challenge whether the alleged acts constituted sexual intercourse or oral sodomy, nor whether T.V. consented, we focus solely on sufficiency of the evidence that T.V. was overcome by fear.

In *State v. Borthwick*, 255 Kan. 899, 914, 880 P.2d 1261 (1994), this court affirmed a rape verdict finding that a victim with a physical disability had been overcome by fear even though the victim showed no outward sign of fear beyond communicating lack of consent and the defendant did not use violence or threats of violence. See 255 Kan. at 913 ("[A] finding that a particular victim is overcome by fear does not require proof that it is fear induced by threat of force that would prevent resistance by a reasonable person."). We recognized that fear itself is inherently subjective under the rape statute: "What renders one person immobilized by fear may not frighten another at all." 255 Kan. at 913. Because it is subjective, whether a rape victim is overcome by fear is generally a question to be resolved by the fact-finder in context with more concrete facts, such as the relative size and strength of the defendant and particular vulnerability of the victim. In making this determination, the fact-finder necessarily considers the reasonableness of the rape victim's claim that she was overcome by fear in deciding whether the victim's claim is credible and sufficient to warrant conviction. 255 Kan. at 911.

Thus, although Ninh frames his challenge as a lack of sufficient evidence, his argument is really an attempt to reassess the jury's decision about the reasonableness of the fear to which T.V. testified. But based on the holding in *Borthwick*, whether T.V.'s fear was reasonable is a question for the jury that we do not disturb on appeal. See 255 Kan. at 913-14.

We find T.V.'s testimony provides sufficient evidence to support the jury's finding that T.V. was overcome by fear during the times when Ninh touched her breasts and vagina. At trial, T.V. explained she often felt "forced" to engage in these acts and never

fought back out of fear the family would break apart or something else "might happen to me or my siblings." And she thought if she refused, Ninh would do the same things to her, only more forcefully. T.V. believed Ninh would just continue his sexual advances, stating "it's going to happen eventually," so it was better to get it over with so there would be a break in it happening. She said when Ninh came to her bedroom at night, she hid her face under the comforter so she did not have to see what he was doing. Finally, T.V. explained one of the reasons she stayed on video calls with her boyfriend late at night was to prevent Ninh from engaging in sexual acts with her: "So I like it when things stopped happening, and so that's why talking to him make me feel like this is going to prevent everything that ever happens, make it never happen."

Reviewing the evidentiary record as a whole in the light most favorable to the prosecution, we are convinced the jury could have reasonably believed that T.V. was overcome by fear during Ninh's acts constituting rape when she was 14 and 15 and during Ninh's acts constituting aggravated criminal sodomy when she was 15 and 16.

II.  *Vagueness*

A.  *Standard of Review and Legal Framework*

Ninh argues the rape and aggravated criminal sodomy statutes are unconstitutionally vague, both as applied to the facts of his case and on their face, and his convictions for those crimes must be reversed as a result. Whether a statute is constitutional presents a question of law over which this court exercises unlimited review. *State v. Bodine*, 313 Kan. 378, 396, 486 P.3d 551 (2021). This court presumes statutes are constitutional and resolves all doubts in favor of a statute's validity. *In re A.B.*, 313 Kan. 135, 138, 484 P.3d 226 (2021). As the party challenging the statute, Ninh bears the burden of overcoming the presumption of constitutionality. See *State v. Gonzalez*, 307 Kan. 575, 579, 412 P.3d 968 (2018).

The test to determine whether a criminal statute is unconstitutionally vague is whether it (1) fails to give fair warning of what conduct is prohibited to those potentially subject to it or (2) fails to adequately guard against arbitrary and unreasonable enforcement. *State v. Williams*, 308 Kan. 1439, 1460, 430 P.3d 448 (2018). Ninh challenges the rape and aggravated criminal sodomy statutes under both prongs of this test. He first contends that the statutes fail to give adequate notice because the concept of "fear" is inherently subjective. He further argues that the statutes enable arbitrary enforcement by prohibiting defendants from asserting defenses based on their lack of knowledge—either that the victim did not consent or that the victim was overcome by force or fear.

Ninh has standing to pursue both claims. To establish standing in Kansas courts, parties must satisfy a two-part test: they must demonstrate both a "'cognizable injury'" and "'a causal connection between the injury and the challenged conduct.'" *League of Women Voters of Kansas v. Schwab*, 317 Kan. 805, 813, 539 P.3d 1022 (2023). Defendants generally have standing to raise fair-notice and arbitrary-enforcement challenges to statutes under which they were convicted. Such convictions constitute concrete injuries traceable to statutes that—if the defendant is correct—either failed to give notice that the conduct was prohibited (in fair-notice challenges) or impermissibly delegated the legislative power to define crimes to other branches of government (in arbitrary-enforcement challenges). See *State v. Stubbs*, 320 Kan. ___ (No. 125,003, this day decided), slip op. at 17-25.

Ninh also preserved this issue for appeal by objecting to the "not a defense" language in the jury instructions and by raising his vagueness argument in both his motion for a new trial and at the sentencing hearing. See *State v. Ninh*, 63 Kan. App. 2d 91, 101, 525 P.3d 767 (2023).

15

B. *Vagueness Challenge*

K.S.A. 21-5503(a)(1)(A) defines the crime of rape, and subsection (e) prevents a defendant from raising certain defenses to that crime:

"(a) Rape is:

(1) Knowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse under any of the following circumstances:

(A) When the victim is overcome by force or fear[.]

. . . .

"(e) . . . it shall not be a defense that the offender did not know or have reason to know that the victim did not consent to the sexual intercourse, that the victim was overcome by force or fear, or that the victim was unconscious or physically powerless."

K.S.A. 21-5504(b)(3)(A) defines the crime of aggravated criminal sodomy, and subsection (f) prevents a defendant from raising certain defenses to that crime:

"(b) Aggravated criminal sodomy is:

. . . .

(3) sodomy with a victim who does not consent to the sodomy or causing a victim, without the victim's consent, to engage in sodomy with any person or an animal under any of the following circumstances:

(A) When the victim is overcome by force or fear[.]

. . . .

16

"(f) . . . it shall not be a defense that the offender did not know or have reason to know that the victim did not consent to the sodomy, that the victim was overcome by force or fear, or that the victim was unconscious or physically powerless."

## 1.  *Fair Notice*

Under the first part of the vagueness test, we consider whether the statute provides a person of ordinary intelligence fair notice of the conduct that is prohibited. *State v. Bollinger*, 302 Kan. 309, 318, 352 P.3d 1003 (2015). Ninh argues the rape and aggravated criminal sodomy statutes fail to give fair notice of the conduct constituting these crimes because the concept of a victim being "overcome by fear" is so subjective it has "no limits." As Ninh puts it, the State can "charge 'someone with rape or aggravated criminal sodomy even if the accused was unaware their sexual partner was overcome by force or fear'" having done nothing more than "'knowingly . . . have sex or sodomy.'" See *Ninh*, 63 Kan. App. 2d at 103. But to accept Ninh's argument would require us to hold, as a matter of law, that a statute is unconstitutionally vague any time a statutory term requires a subjective evaluation. This is not the legal standard. Instead, we must determine whether, as applied to the facts in Ninh's case, the statutes prohibiting nonconsensual sexual acts "when the victim is overcome by fear" provides a person of ordinary intelligence fair notice of the conduct prohibited. "A statute is not invalid for vagueness or uncertainty where it uses words of commonly understood meaning." *Hearn v. City of Overland Park*, 244 Kan. 638, 642, 772 P.2d 758 (1989).

### a.  *"Overcome"*

The primary aim of statutory interpretation is to give effect to the Legislature's intent, expressed through the plain language of the statute. If a statute is plain and

17

unambiguous, we will not speculate about the legislative intent behind that clear language. We do not add or ignore statutory requirements, and we give ordinary words their ordinary meanings. *In re M.M.*, 312 Kan. 872, 874, 482 P.3d 583 (2021).

Although it appears several times in the sex offenses chapter of the Kansas criminal code, the term "overcome" is not statutorily defined. When not otherwise defined, words in a statute are to be given their plain meaning and read in context with surrounding language. See K.S.A. 77-201; *State v. LeClair*, 295 Kan. 909, 913, 287 P.3d 875 (2012). But as this court expressed in *Brooks*, the term is in common use. See 298 Kan. at 691-92. The dictionary definition of "overcome" is "to get the better of" or "surmount." Merriam-Webster Online Dictionary. Synonyms of the term include "overpower," "conquer," and "subdue." Merriam-Webster Online Thesaurus. The ordinary and common meaning of "overcome" conveys a legislative intent to criminalize nonconsensual sexual intercourse when a victim is overcome by force or fear. We conclude a person of ordinary intelligence would understand what is meant by the word "overcome" as used in the rape and sodomy statutes and have fair notice of the unlawful underlying conduct to avoid committing these crimes.

b.   *"Fear"*

This court has held the term "fear" as used in the rape and sodomy statutes was not meant to have an absolute definition because the concept of fear is subjective. See, e.g., *Brooks*, 298 Kan. at 687; *Borthwick*, 255 Kan. at 913. The concept of fear is inherently subjective because people experience fear in different ways; there is no one, uniform way to be afraid that can be objectively measured. After all, "[w]hat renders one person immobilized by fear may not frighten another at all." *Borthwick*, 255 Kan. at 913.

18

Consistent with this principle, we have upheld rape verdicts based on a wide range of fears. See, e.g., *Brooks*, 298 Kan. at 690 (victim testimony that she feared the defendant would disclose an extra-marital affair she was having with a coworker if she did not have sex with him was sufficient to establish actus reus of rape); *Borthwick*, 255 Kan. at 912 (victim testimony she was afraid and felt powerless to stop the defendant from penetrating her vagina without consent was sufficient to establish actus reus of rape without the defendant having issued any specific threats of harm); *State v. Bishop*, No. 118,896, 2019 WL 2398044, at *8, 11 (Kan. App. 2019) (unpublished opinion) (victim testimony that she feared the defendant would mistreat her or abandon her mother, leaving the two of them in financial hardship, was sufficient to establish she was overcome by fear to sustain a rape conviction).

Notwithstanding this precedent, Ninh argues that the lack of a statutory definition, coupled with the subjective nature of "fear" in the rape and aggravated criminal sodomy statutes, fail to give fair notice of the conduct constituting these crimes. But this court has rejected a constitutional vagueness challenge to identical force or fear language in a prior version of the rape statute. See *State v. Cantrell*, 234 Kan. 426, 435, 673 P.2d 1147 (1983) (concluding rape statute was "clear, readily understandable by persons of common intelligence and as such was constitutional"). We reach the same conclusion here.

2. *Arbitrary and Unreasonable Enforcement*

A statute invites arbitrary enforcement when it so insufficiently defines a crime that it effectively vests judicial or executive actors with the discretion to determine what conduct is sanctionable "'on an ad hoc and subjective basis.'" *State v. Harris*, 311 Kan. 816, 824, 467 P.3d 504 (2020). Ninh argues that the rape and aggravated-criminal-sodomy statutes allow for ad hoc and subjective enforcement because both statutes provide that "it shall not be a defense that the offender did not know or have reason to know that the victim did not consent to the sexual intercourse" or "the sodomy" or "was

19

overcome by force or fear." K.S.A. 21-5503(e); K.S.A. 21-5504(f). In his view, those provisions allow a prosecutor to charge either crime "knowing they do not have to prove the accused knowingly did anything other than have sex or sodomy."

Ninh's argument is unpersuasive. To secure a conviction under either statute, the State must prove every element of the offense beyond a reasonable doubt. *State v. Brown*, 303 Kan. 995, 1001, 368 P.3d 1101 (2016). As the panel below noted, the elements of both "statutes require the State to prove more than the accused merely engaged in sexual intercourse or sodomy with the victim"—the State must prove that "the victim did 'not consent to the' sexual intercourse or sodomy" and that the victim was "'overcome by force or fear.'" *Ninh*, 63 Kan. App. 2d at 103-04; see K.S.A. 21-5503(a)(1)(A); K.S.A. 21-5504(b)(3)(A). The fact that the defendant cannot raise a particular defense does not relieve the State of its burden to prove these elements beyond a reasonable doubt. And executive and judicial actors cannot enforce these statutes against individuals just for engaging in sex or sodomy.

Thus, in enacting K.S.A. 21-5503 and K.S.A. 21-5504(f), the Legislature did not improperly delegate its exclusive power to define criminal conduct to other branches of government, contrary to separation-of-powers principles. Ninh has failed to establish that either statute invites arbitrary enforcement.

In sum, we conclude both statutes give fair warning of prohibited conduct and include explicit standards of enforcement. They state the elements required to prove a violation and are understandable to persons of ordinary intelligence, even though a victim's fear is subjective. And both statutes articulate definite and precise standards capable of fair application, which necessarily guard against arbitrary interpretation and enforcement of the laws. Thus, we reject Ninh's contention that K.S.A. 21-5503(a), (e) and K.S.A. 21-5504(b), (f) are unconstitutionally vague.

III. *Unanimous Verdict*

Ninh claims he was denied his right to a unanimous verdict in violation of the Sixth Amendment to the United States Constitution, section 5 of the Kansas Constitution Bill of Rights, and K.S.A. 22-3421. Ninh preserved the issue in part by raising the federal constitutional challenge in his motion for a new trial. To the extent he can raise such a challenge under the Kansas Constitution, the Court of Appeals panel noted it was not preserved. See *Ninh*, 63 Kan. App. 2d at 118-19. But the panel agreed to consider the state constitutional challenge for the first time on appeal under exceptions for claims involving only questions of law that are finally determinative of the case and those necessary to prevent the denial of fundamental rights. 63 Kan. App. 2d at 118-19.

In support of his unanimity claim, Ninh argues the State presented multiple acts for each of the charges lodged against him and none were specific enough for the jury to unanimously agree on the underlying acts for each conviction. A multiple acts case is one in which several distinct and separate acts are alleged, any one of which could constitute the crime charged. In a multiple acts case, the jury must unanimously agree on the act constituting the crime. To ensure jury unanimity, courts require either (1) the State to tell the jury which act to rely on for each offense, or (2) the district court to instruct the jury to agree on a specific act for each offense. *State v. Cottrell*, 310 Kan. 150, 154-55, 445 P.3d 1132 (2019). The failure to elect or instruct is error, subject to the harmless error test. *State v. Santos-Vega*, 299 Kan. 11, 18, 321 P.3d 1 (2014).

In *State v. Voyles*, 284 Kan. 239, 160 P.3d 794 (2007), this court set out a three-part test to determine when a multiple acts situation has occurred such that the jury must agree on the same underlying criminal act. First, the court must determine whether the case truly involves multiple acts:  whether the defendant's conduct was part of one act or represents multiple acts which are separate and distinct from each other. Second, the court must consider whether error occurred:  whether there was a failure by the State to

21

elect an act or a failure by the district court to instruct. Third, the court must determine whether the error is reversible. 284 Kan. at 252-53.

The State agrees it presented a multiple acts case so we begin by considering whether error occurred—specifically, whether the State told the jury which act to rely on in its deliberations or the court instructed the jury to agree on a specific criminal act. Here, the State organized the evidence and the corresponding charges chronologically based on the nature of the abuse as T.V. could recall it during a particular school year. To support each of Ninh's convictions, the State presented T.V.'s testimony of multiple acts of alleged sex abuse, any one of which could have constituted the individual crimes charged. But in closing arguments, the prosecutor attempted to establish the evidence that could support each underlying charge and mentioned the unanimity requirement at least once when introducing the counts. The district court also properly issued a multiple acts instruction for the relevant charged offenses, telling the jury that the "State claims distinct multiple acts which could each separately constitute the crime" and directing the jury that it "must unanimously agree upon the same underlying act" for each offense. Courts must presume that jury members follow the instructions given. *State v. Gray*, 311 Kan. 164, 172, 459 P.3d 165 (2020). And this court's precedent treats such an instruction as immunizing a verdict from a subsequent challenge on this basis. Therefore, we find no unanimity error.

IV. *Prosecutorial Error*

We review prosecutorial error claims in two steps:  error and prejudice. First, we determine whether the alleged acts "'fall outside the wide latitude afforded prosecutors to conduct the State's case.'" *State v. Blansett*, 309 Kan. 401, 412, 435 P.3d 1136 (2019). Second, if we find error, we then "'determine whether the error prejudiced the defendant's due process rights to a fair trial.'" 309 Kan. at 412. In the second step, we apply the constitutional harmlessness standard laid out in *Chapman v. California*, 386 U.S. 18, 87

22

S. Ct. 824, 17 L. Ed. 2d 705 (1967), which demands the State show beyond a reasonable doubt that the prosecutorial error did not affect the trial's outcome in light of the entire record. The ultimate question is whether there is no reasonable possibility that the error contributed to the verdict. *Blansett*, 309 Kan. at 412.

On appeal, Ninh raised multiple claims of prosecutorial error; the panel rejected all but one. As to the single instance of error, the panel found the prosecutor misstated the law in her closing argument when she said that Ninh's "form of force was grooming." *Ninh*, 63 Kan. App. 2d at 117. But the panel found this error did not affect the verdict and so was harmless. 63 Kan. App. 2d at 117-18.

Both the State and Ninh challenge the panel's findings of prosecutorial error on the grooming as force statement. In its cross-petition, the State contends the panel erred by concluding the prosecutor's mention of "grooming" as a type of force was error. Ninh challenges the panel's decision finding the error harmless beyond a reasonable doubt. Ninh also raises three other prosecutorial errors: two references to "some rapists" and one statement calling Ninh a rapist. We address each of the claimed errors in turn.

A. *Grooming as Force*

During closing rebuttal, the prosecutor mentioned grooming as a type of force rapists use to confuse, wear down, and eventually overcome their victims. The following excerpt put the statement in context:

> "[T.V.] described that they're engaging in their typical conversation where the defendant is treating her like an adult, treating her like a confidant, the type of confidant who has promises, who has secrets from everyone else in the family.
>
> . . . .

"He's treating her like she's special. She described how that type of touching he would engage in all through her teenage years, it wasn't the type of touching where—you know, some rapists are sadists. Some of them cause pain. Some rapists use alcohol so a victim doesn't know or is incapacitated and can't respond back. *His form of force was grooming.*

"His form of force was making sure it felt good so that way, if nothing else, she was confused. If nothing else, she would feel pleasure. She describes feeling those sensations. She may have had orgasms or climaxed during these activities because he wanted to make sure she would keep giving it up to him, and that's the kind of force that is insidious in his actions." (Emphasis added.)

We begin our error analysis by considering whether the prosecutor's comment falls outside the wide latitude afforded prosecutors to conduct the State's case. "This court has repeatedly held that in closing argument, a prosecutor may draw reasonable inferences from the evidence but may not comment upon facts outside the evidence." *State v. Hall*, 292 Kan. 841, 848, 257 P.3d 272 (2011). Here, the prosecutor argued in closing that Ninh's grooming satisfied the element of "force" in the context of Ninh's crimes of rape and aggravated criminal sodomy. The comment was based on the prosecutor's direct examination of Detective Zandler:

"Q. This type of escalation of sexualized touching over a long period of time, does it have any sort of specific terminology?

"A. Yes. They call it grooming behavior.

. . . .

"Q. There are different types of force that you've seen utilized during your career by individuals committing sex acts on children?

"A. Yes. Several different types.

24

"Q. Okay. Force can come in many different styles, many different types?

"A. Yes.

"Q. Grooming behavior, is that one type of force that you've seen used?

"A. Yes."

Based on this exchange, the prosecutor effectively told the jury in closing that Detective Zandler's testimony established an essential element of the crimes: that T.V. was overcome by the force of Ninh's grooming. The State maintains there is no error because the prosecutor properly drew an inference from Detective Zandler's testimony. We disagree, finding it unreasonable to draw such an inference from an isolated one-word sweeping acknowledgment that grooming behavior is one type of force he has seen used in sex cases. This is especially true given the only definition of grooming provided to the jury was generally stated as a "type of escalation of sexualized touching over a long period of time."

We have acknowledged that grooming is a psychological concept with a specific meaning in the context of sexual abuse, which typically requires an expert to explain the concept. See *State v. Akins*, 298 Kan. 592, 604-05, 315 P.3d 868 (2014). Detective Zandler did not explain the psychological concept of grooming or how Ninh and T.V.'s behavior fit within the grooming sexual exploitation model. And Detective Zandler did not provide any connection between Ninh's grooming behavior and T.V. submitting to the nonconsensual acts because she was overcome by force. And we doubt he could have, because the State presented no evidence T.V. submitted to the nonconsensual sexual acts because she was overcome by force. All the evidence supported a finding that T.V.

submitted to the nonconsensual sexual acts because she was overcome by *fear*. Thus, we find the prosecutor erred by going beyond the latitude allowed by discussing facts not in evidence.

Notably, our finding of error is based on the prosecutor discussing facts not in evidence, which differs from the Court of Appeals' finding that the "grooming as a form of force" comment was a misstatement of the law. See *Ninh*, 63 Kan. App. 2d at 116-17. We disagree and thus disapprove of the panel's conclusion in this regard. Simply put, we cannot exclude as a matter of law the possibility that the State could present sufficient evidence in another case to establish a victim was overcome by force (or fear) because of a perpetrator's grooming, especially if an expert explains the psychological concept of grooming, describes how the perpetrator and victim's behavior fit within the grooming sexual exploitation model, and connects the grooming behavior to evidence that the victim was overcome by force or fear.

Because we have found error, we now must determine whether the error prejudiced the defendant's due process rights to a fair trial. Because the error implicates constitutional rights, the State has the burden to show beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the rest of the record. Prosecutorial error is harmless "'where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Ninh argues the prosecutor's grooming as force statement was not harmless because it was one of the last comments the prosecutor made about force, which goes to prove one of the material elements of the crimes. We disagree. First, although evidence of force came up several times during closing argument, the only reference to grooming as force was in the brief excerpt provided above. Moreover, we have already found

sufficient evidence that T.V. was overcome by fear. Thus, we find the State has met its burden to show beyond a reasonable doubt that the "grooming as force" error did not affect the outcome of the trial in light of the rest of the record.

B. *"Some rapists" and Calling Ninh "a rapist"*

Ninh claims the prosecutor erred by referring twice to what "some rapists" do and by calling Ninh a rapist. Ninh cites to a pretrial order in limine, which prohibits the use of prejudicial labels during trial such as "victim" and "sexual assault" or "sexual abuse." He argues the word or label "rapist" is far worse than any of the terms the parties agreed and were ordered not to use during trial.

1. *"Some rapists"*

Ninh contends the prosecutor committed reversible error in closing argument by describing the behavior of "some rapists."

> "He's treating her like she's special. She described how that type of touching he would engage in all through her teenage years, it wasn't the type of touching where—you know, *some rapists* are sadists. Some of them cause pain. *Some rapists* use alcohol so a victim doesn't know or is incapacitated and can't respond back. His form of force was grooming." (Emphases added.)

Ninh argues these statements improperly discuss facts not in evidence. He also argues the statements were irrelevant and inflammatory.

Ninh is correct that there is no evidence in the record to establish that some rapists are sadists. And after Ninh's counsel objected, Detective Zandler was prevented from answering a general question about investigations into offenders who "use alcohol to incapacitate the person they want to have sexual intercourse with." But four questions

27

later, the prosecutor narrowed the question to ask whether the detective had seen incapacitation of the victim with alcohol or drugs *as a type of force* used in sexual abuse cases and the detective responded he had. But we question whether the prosecutor's general comment in closing stating some rapists use alcohol to incapacitate a victim—which the court prevented the detective from saying based on a lack of relevance—is supported by the detective's testimony about incapacitation by alcohol or drugs as force in sexual abuse cases. Still, even if we assume without deciding that the prosecutor erred by making these comments, we conclude the error was harmless beyond a reasonable doubt. First, the comments did not concern Ninh or how he was alleged to have committed the crimes. Second, the comments were isolated and there is no evidence the prosecutor made them to inflame the passions or prejudices of jurors. Simply put, we find no reasonable possibility the prosecutor's statement—noting that "some rapists" are sadists and "some rapists" use alcohol or drugs to incapacitate their victims—contributed to the verdict.

### 2. *Calling Ninh "a rapist"*

Ninh also claims the prosecutor erred by repeatedly calling him a rapist. Like the panel, we have found only one instance that can be construed as the prosecutor calling Ninh a rapist. In the context of discussing the DNA evidence found on the victim's breast, the prosecutor said:

> "And when they get investigated, the evidence that is found is the evidence that the defendant, the suspect, leaves behind. *It is the evidence that the rapist leaves behind.* He did away with the evidence by wiping it off of [the victim]. He may not have even ejaculated fully, but ultimately he wiped away whatever evidence was going to be on his body. He wiped away the evidence he thought he had left behind on her body. He forgot . . . he didn't wipe away her breast. He didn't wipe his saliva off of her breast, and ultimately that saliva was preserved and it was intact because [the victim] was wearing the same bra that she had worn prior to the attack." (Emphasis added.)

28

Ninh argues the prosecutor's comment calling him a rapist who left evidence behind was inflammatory and outside the wide latitude afforded prosecutors to comment on the evidence. Although this court has not discussed the propriety of referring to a defendant as a "rapist" in closing argument, our decision in *State v. Scott*, 286 Kan. 54, 183 P.3d 801 (2008), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016), provides guidance for our analysis. In *Scott*, a capital murder case, the prosecutor referred to Scott as a "murderer" and "killer" several times in closing argument. 286 Kan. at 80. After reviewing the context of the references, we concluded some comments were proper and some were improper. In differentiating between the proper and improper comments, we reasoned:

> "The consistent rule to be taken from the cases is that a prosecutor may refer to the defendant as a murderer or killer in the course of arguing the evidence shows the defendant committed the murder. However, where such statements imply the prosecutor believes something other than the evidence shows the defendant to be a murderer, such as the prosecutor's belief the defendant 'looks like a murderer' or has 'cold-blooded killing eyes,' or the statements do not relate to the evidence but are simply made to inflame the jury, such as a comment telling the jurors they are 'eight feet from a killer,' the argument will be held improper. [Citations omitted]." *Scott*, 286 Kan. at 81-82.

Here, the context in which the challenged comment was made readily establishes the prosecutor was arguing the evidence showed that Ninh committed the crime of rape. The prosecutor's comment referring to Ninh as a rapist who left evidence behind was not improper but a fair comment based on the evidence. Since the prosecutor's comment was made in the proper context, there was no error.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*  *  *

BILES, J., concurring in part and dissenting in part:  I concur in the result. I disagree with the majority's standing analysis from *State v. Stubbs*, 320 Kan. ___ (No. 125,003, this day decided), slip op. at 16-26. I explained my reasons in that decision. *Stubbs*, 320 Kan. ___, slip op. at 27-30 (Biles, J., concurring in part and dissenting in part).

*  *  *

STANDRIDGE, J., concurring:  I agree with the majority's decision to uphold Ninh's convictions. But I write separately to register my disagreement with the majority's vagueness analysis on two main points.

First, I disagree with the majority's decision to entertain a facial vagueness challenge to the statutes at issue. While I agree that Ninh has jurisdictional standing by virtue of being convicted under the challenged laws, I cannot join the majority in disregarding the prudential limitations that have long governed our review of constitutional claims, particularly vagueness challenges.

Second, I disagree with the majority's decision to split the vagueness test into two parts—fair notice as a federal due process issue, and arbitrary enforcement as a state separation of powers concern. I dissented on this issue in *State v. Stubbs*, 320 Kan. ___ (No. 125,003, this day decided), slip op. at 26-50 (Standridge, J., dissenting), and continue to believe this added complexity is unwarranted and rests on shaky legal ground.

For these reasons, I would limit review here to whether the challenged provisions of the rape and sodomy statutes are unconstitutionally vague—under both the fair-notice and arbitrary-enforcement prongs of the vagueness test—*as applied* to the facts in Ninh's

30

case, not in the hypothetical or abstract. Although I disagree with the majority's analysis, I ultimately concur in the result because Ninh's vagueness challenges fail under both the well-established approach and the majority's newly crafted approach. I join the remainder of the opinion in full.

1. *Jurisdictional standing should not compel facial review of a constitutional challenge.*

As a threshold matter, I narrowly agree with the majority's conclusion that Ninh establishes jurisdictional standing to raise a vagueness challenge of the rape and sodomy statutes by virtue of his convictions under these statutes. See *State v. Ninh*, 320 Kan. ___ (No. 122,782, this day decided), slip op. at 15. This issue was settled in *Stubbs*. See *Stubbs*, 320 Kan. at ___, slip op. at 15 (holding Kansas jurisdictional standing requirements of cognizable injury and causal connection between injury and challenged conduct are satisfied by criminal conviction under an allegedly vague statute). However, I disagree with the majority's assumption that once a defendant has "standing," the court must automatically conduct a facial review of their vagueness challenge.

Facial constitutional challenges are disfavored for good reason—because they "rest on speculation, run contrary to the fundamental principle of judicial restraint, and threaten to short-circuit the democratic process." *City of Lincoln Center v. Farmway Co-Op, Inc.*, 298 Kan. 540, 548, 316 P.3d 707 (2013) (citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51, 128 S. Ct. 1184, 170 L. Ed. 2d 151 [2008]). As such, courts have historically allowed facial challenges only in exceptional cases. See *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 743, 98 S. Ct. 3026, 57 L. Ed. 2d 1073 (1978) ("Invalidating any rule on the basis of its hypothetical application to situations not before the Court is 'strong medicine' to be applied 'sparingly and only as a last resort.'") (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S. Ct. 2908, 37 L. Ed. 2d 830 [1973]). None of the federal exceptions warranting facial review

apply here. See *City of Chicago v. Morales*, 527 U.S. 41, 55, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) (facial review justified of criminal law that "infringes on constitutionally protected rights" and "contains no *mens rea* requirement"); see also *Johnson v. United States*, 576 U.S. 591, 605, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015) (facial review proper when "the experience of the federal courts leaves no doubt about the unavoidable uncertainty and arbitrariness of adjudication under the residual clause").

Pre-*Stubbs*, we generally limited the scope of our review in vagueness challenges to the facts of the particular case, consistent with federal law. See *State v. Brown*, 305 Kan. 674, 698, 387 P.3d 835 (2017) ("'We consider whether a statute is vague as applied to the particular facts at issue.'") (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19, 130 S. Ct. 2705, 177 L. Ed. 2d 355 [2010]); *Hainline v. Bond*, 250 Kan. 217, 226, 824 P.2d 959 (1992) ("[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand . . . . This means that the statute is judged on an 'as-applied' basis.") (quoting *United States v. Mazurie*, 419 U.S. 544, 550, 95 S. Ct. 710, 42 L. Ed. 2d 706 [1975], and *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S. Ct. 1853, 100 L. Ed. 2d 372 [1988]). Likewise, we declined to engage in facial review when there was no constitutional defect in the application of the statute to the litigant. See *State v. Williams*, 299 Kan. 911, 918, 329 P.3d 400 (2014) (rejecting facial vagueness challenge on grounds statute would be unconstitutional if applied to third parties in hypothetical situations) (citing *Ulster County Court v. Allen*, 442 U.S. 140, 155, 99 S. Ct. 2213, 60 L. Ed. 2d 777 [1979]).

But *Stubbs* did away with these prudential restraints on arbitrary-enforcement vagueness challenges, while saving for another day the issue of whether these limits still apply to challenges under the fair-notice prong of the vagueness test. See *Stubbs*, 320 Kan. at ___, slip op. at 15. Although Ninh brings his vagueness challenge under *both*

prongs of the vagueness test, the majority again avoids the issue and, without explanation, reviews Ninh's fair-notice challenge *as-applied* and his arbitrary-enforcement challenge *facially*. See *Ninh*, 320 Kan. at ___, slip op. at 14-20.

Contrary to the position taken by the majority, I believe we should review Ninh's vagueness challenges *as applied* to the facts of this case under both the fair-notice and arbitrary-enforcement prongs of the test. And frankly, I don't understand the majority's decision to perform a different scope of review under the two prongs of the test. Given a majority of this court has eliminated prudential limits in arbitrary-enforcement vagueness challenges, I can see no rationale for maintaining them in fair-notice challenges. If prudential limits no longer apply, doesn't every constitutional challenge become a facial challenge? Assuming so, Ninh's fair-notice vagueness challenge should be treated no differently than his arbitrary-enforcement challenge. Without any explanation as to what now drives the scope of review in constitutional challenges, I fear the majority's decision today will cause confusion for lower courts—not only when reviewing vagueness challenges but when reviewing constitutional challenges in general.

For my part, I disagree that we should exercise facial review over every vagueness challenge and reiterate my concern that this approach puts us in the position of searching for statutory specificity detached from the concrete facts of a given case, which is not the purpose of the vagueness doctrine. See *Stubbs*, 320 Kan. at ___, slip op. at 52 (Standridge, J., dissenting) (predicting this approach "will transform our courts into roving statutory-review commissions").

2.  *The federal vagueness doctrine has always been a due process safeguard and is not a suitable mechanism to check for state separation of powers violations.*

In addition to altering the scope of our review in vagueness challenges, *Stubbs* bifurcated the vagueness test into a *federal* due process component (fair-notice prong)

and a *state* separation of powers component (arbitrary-enforcement prong). See *Stubbs*, 320 Kan. ___, Syl. ¶ 3. As I expressed in my dissent in *Stubbs*, this added complexity offers no benefit and is based on a questionable legal foundation. 320 Kan. at ___, slip op. at 49 (Standridge, J., dissenting).

The *Stubbs* majority justified this new framework by pointing to the "constitutional underpinnings" of the two prongs of the vagueness test, claiming they have different origins. See *Stubbs*, 320 Kan. at ___, slip op. at 12-14. This notion appears to stem from United States Supreme Court dictum in several cases recognizing the vagueness doctrine's protection against arbitrary or discriminatory law enforcement relates back to the federal separation of powers principle. See *Stubbs*, 320 Kan. at ___, slip op. at 13 (citing *State v. Harris*, 311 Kan. 816, 821, 467 P.3d 504 [2020] [stating the arbitrary enforcement prong of the vagueness test is grounded in the separation of powers doctrines "emanating from both our federal and state constitutions" without citing any authority]); see also *United States v. Davis*, 588 U.S. 445, 451, 139 S. Ct. 2319, 204 L. Ed. 2d 757 (2019) (stating "vague laws rest[] on the twin constitutional pillars of due process and separation of powers"); *Sessions v. Dimaya*, 584 U.S. 148, 156, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018) (plurality opinion) (describing this aspect of the vagueness doctrine as a "corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not"). Yet this interesting constitutional genealogy has not caused the high court or lower federal courts to alter their approach to vagueness challenges; thus, it is unclear why a majority of our court has taken that unnecessary step. See *Stubbs*, 320 Kan. at ___, slip op. at 42-47 (Standridge, J., dissenting) (discussing federal approach to vagueness challenges).

What I believe the majority gets fundamentally wrong here, as in *Stubbs*, is that the vagueness doctrine shields litigants from the *due process harms* of a law that fails to give fair notice or invites arbitrary or discriminatory enforcement. See *Sessions*, 584 U.S.

at 174-75 (noting relationship between due process and separation of powers principles and holding statutory residual clause "'produces more unpredictability and arbitrariness than the Due Process Clause tolerates'"). I acknowledge the Supreme Court's nod to the federal separation of powers principle as a foundational concept that is especially relevant when analyzing the arbitrary-enforcement component of the vagueness test. Indeed, some legal scholars trace all due process principles back to the separation of powers. See *Johnson*, 576 U.S. at 623 (Thomas, J., concurring) (reviewing historical authority discussing competing theories of due process, one of which traces due process to an early conception of the separation of powers doctrine).

Nonetheless, I do not believe that the *federal* vagueness doctrine is a suitable mechanism to check for structural harms to our *state* constitutional fabric. Rather, that is the function of our state separation of powers doctrine, which warrants its own framework for detecting potential violations. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 883-84, 179 P.3d 366 (2008) (listing extensive factors to consider when checking for a separation of powers violation). By contrast, the vagueness doctrine provides a practical framework for courts to analyze federal and state laws for potential due process violations under the Fifth and Fourteenth Amendments based on an individual litigant's alleged conduct, in the majority of cases. There is no reason to depart from this sound approach and many good reasons to retain it.

In sum, I disagree with these recent departures from our vagueness precedent that remove prudential limits on facial challenges, untether the vagueness doctrine from its due process foundation, and create a new framework that is more complicated, less legally sound, and more likely to lead to judicial overreach in constitutional challenges. Thus, with respect to the majority's vagueness analysis, I concur only with its ultimate conclusion that the challenged provisions of the rape and sodomy statutes are not vague, at least as applied to Ninh's facts. And I join the rest of the opinion in full.